[No. S063274. Mar. 6, 2006.]

In re RALPH INTERNATIONAL THOMAS, on Habeas Corpus.

COUNSEL

Alex Reisman and William A. Snyder, Jr., under appointments by the Supreme Court, and John R. Grele for Petitioner Ralph International Thomas.

Bill Lockyer, Attorney General, George Williamson, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Ronald A. Bass and Gerald A. Engler, Assistant Attorneys General, Peggy S. Ruffra, Ronald S. Matthias and Dane R. Gillette, Deputy Attorneys General, for Respondent State of California.

OPINION

**WERDEGAR, J.**—Mary Gioia and Greg Kniffin were "Deadheads," followers of the band the Grateful Dead, who in 1985 traveled with other Deadheads to Berkeley, California, to see one of the band's shows. When they arrived, they stayed in Rainbow Village, a permanent encampment of homeless people on the shores of San Francisco Bay. Sometime during the night of August 15–16, 1985, they were both shot and killed.

Petitioner Ralph International Thomas, a resident of Rainbow Village, was convicted of second degree murder and first degree murder with special circumstances and sentenced to death for the killings of Gioia and Kniffin. We affirmed the convictions and sentence on automatic appeal. (*People v. Thomas* (1992) 2 Cal.4th 489 [7 Cal.Rptr.2d 199, 828 P.2d 101] (*Thomas*).) However, in response to Thomas's petition for a writ of habeas corpus claiming that defense counsel had failed to adequately investigate evidence that someone other than Thomas had committed both murders, we issued an order to show cause and subsequently appointed a referee to hear evidence and make factual findings. The referee has now issued his report, and the parties have filed briefs on the merits.

The key issue in this case was identity: Was Thomas in fact the person who shot Gioia and Kniffin? At trial, the defense presented its theory that someone other than Thomas had committed the murders through the reread preliminary hearing testimony of a lone witness, Vivian Cercy, who testified to seeing Gioia arguing late on the fatal night with a blond man named "Bo." Thomas argues that he received ineffective assistance of counsel because, although numerous additional witnesses were available to offer evidence supporting the theory that "Bo" was the real killer, defense counsel neither sought nor located any of them. In a case hinging on circumstantial evidence, Thomas argues this shortcoming was prejudicial.

We conclude (1) because counsel failed to investigate the available avenues most likely to yield corroboration of Cercy and failed to provide any viable tactical justification for that omission, his performance was deficient, but (2) Thomas has not shown prejudice because, as best as can be determined 20 years after the fact, the fruits of a constitutionally adequate investigation would not have been sufficient to raise a reasonable probability of a more favorable outcome. The order to show cause is discharged.

FACTUAL AND PROCEDURAL BACKGROUND

*The Crimes and Trial*

The following description of the crimes and trial is taken in large part from our decision in Thomas's automatic appeal. (*Thomas*, *supra*, 2 Cal.4th at pp. 504–514.)

On August 15 and 16, 1985, a number of followers of the Grateful Dead rock band were staying at Rainbow Village because the band was scheduled to play locally during the coming weekend. Among them were Mary Gioia and Greg Kniffin. During the early morning hours of August 16, 1985, Gioia and Kniffin were beaten and shot at point-blank range near Rainbow Village.[1] Gioia's body was seen floating in the San Francisco Bay on the morning of August 16; Kniffin's body was recovered by an underwater dive team the next day.

Thomas was arrested shortly after the murders. The prosecution's case consisted entirely of circumstantial evidence falling generally into four categories: Thomas's ownership of a high-powered rifle that could have inflicted the fatal wounds, which he was seen using the night of August 15 but claimed was stolen immediately thereafter; sightings of Thomas alone with the victims shortly before the killings; Thomas's conduct and statements after the killings, collectively suggesting consciousness of guilt; and certain additional physical evidence, including recovery of a corncob pipe at the murder scene that was argued to have been Thomas's.

The defense centered on the testimony of Vivian Cercy. Cercy testified at the preliminary hearing but was unavailable at trial, so her prior testimony was read to the jury. Her testimony pointed to a third party, a blond man, as potentially responsible for the murders. Cercy testified that on the night of August 15–16, she was parked in her car outside Rainbow Village when she witnessed a discussion/argument between three people. Two of the people

---

[1] In early 1985, the City of Berkeley set aside a landfill area near the Berkeley Marina to provide living space for people who had previously been living in their vehicles on the public streets. The area became known as Rainbow Village. Thomas lived there.

resembled Gioia and Kniffin; the third, a tall blond man she did not know, she referred to as "Bo." After the discussion/argument, the woman walked off; the blond man followed. Minutes later, Cercy heard sounds that could have been firecrackers or gunshots. Later that night, she saw the blond man washing his hands in a sink and throwing something over a fence. Still later, a man she could not describe knocked on her car door, asked her a few questions, and threatened to kill her.

The jury convicted Thomas of first degree murder for killing Kniffin and second degree murder for killing Gioia. (Pen. Code, § 187.)[2] It found true a multiple-murder special circumstance. (§ 190.2, subd. (a)(3).) It also found true allegations that Thomas used a firearm in the commission of each murder. (§ 12022.5.) The jury returned a verdict of death, and we affirmed. (*Thomas, supra,* 2 Cal.4th at p. 504.)

### The Habeas Corpus Proceedings

During the pendency of Thomas's automatic appeal, appellate counsel filed a petition for writ of habeas corpus, and Thomas filed, in propria persona, a habeas corpus petition raising an issue not presented in counsel's petition; we denied both.

On April 15, 1996, Thomas filed his first federal petition for a writ of habeas corpus. The United States District Court for the Northern District of California stayed federal proceedings, allowed Thomas to amend his federal petition to delete all unexhausted claims, and directed him to present to this court all claims identified by the district court as unexhausted. Thomas complied by filing the present exhaustion petition on August 1, 1997.

We issued an order to show cause based on Thomas's allegation that he would have obtained a better outcome at trial had his trial counsel, Alameda County Public Defender James Chaffee, investigated and presented witnesses who could corroborate Vivian Cercy's testimony and support a theory of third party culpability. Thomas identified Megan Barry, David Kohn, Daniel Adams, and Claus von Wendel as four witnesses defense counsel should have located and called. In the return, the People, represented by the Attorney General, defended the adequacy of Chaffee's investigation. Thomas, by his traverse, placed at issue the truth of the People's denials. Because an evidentiary hearing was necessary to determine whether an investigation of the kind Thomas alleged trial counsel should have conducted would have yielded third party culpability evidence that would have made any difference, we appointed a referee to hear evidence and answer the following factual questions concerning Defense Counsel Chaffee's performance.

---

[2] All subsequent statutory references are to the Penal Code.

*Counsel's Performance*

1. What information did trial counsel James Chaffee have, prior to trial, concerning the possible identity of the blond man Vivian Cercy testified she saw with persons who apparently were Mary Gioia and Greg Kniffin, on the night they were killed?

2. What action, if any, did Chaffee take to investigate this information prior to trial?

3. If Chaffee investigated incompletely or not at all, what, if any, were his reasons?

*Prejudice*

4. Did Chaffee know, or could he reasonably have learned, prior to trial, of the existence, whereabouts, and potential usefulness as witnesses of Megan Barry, David Kohn, Daniel Adams, and Claus von Wendel?

5. If Chaffee could have contacted these potential witnesses, what information would they have provided?

6. Would they have testified at petitioner's trial and, if so, to what effect?

The referee heard testimony from nearly two dozen witnesses, including Defense Counsel Chaffee and the four witnesses identified in the reference order. He also considered a wealth of documentary evidence. After the close of evidence, the referee solicited proposed findings from each side, took the matter under submission, and issued detailed findings on each of the six referred questions. Briefly summarized, those findings indicate that the witnesses Thomas faults Chaffee for not locating and calling at trial either could not have been located, were not credible, lacked firsthand knowledge relevant to the killings, or had some combination of all three shortcomings.

The parties have filed postreference briefs on the merits, and Thomas has filed exceptions to the referee's report; the Attorney General does not take exception to any of the referee's findings. We address the referee's individual findings and Thomas's specific exceptions to them only insofar as they are relevant to the two questions before us: (1) Did Thomas receive reasonably effective assistance from counsel; and (2) if not, was his defense prejudiced?

DISCUSSION

### I. *Legal Framework*

■ The general standards applicable to Thomas's ineffective assistance of counsel claim are well settled. " '[I]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687–688 [80 L.Ed.2d 674, 104 S.Ct. 2052] [(*Strickland*)]; [*People* v.] *Ledesma* [(1987)] 43 Cal.3d [171,] 215–216 [233 Cal.Rptr. 404, 729 P.2d 839].) Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citations.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Avena* (1996) 12 Cal.4th 694, 721 [49 Cal.Rptr.2d 413, 909 P.2d 1017]; accord, *People v. Carter* (2003) 30 Cal.4th 1166, 1211 [135 Cal.Rptr.2d 553, 70 P.3d 981].)

In evaluating Thomas's claim, we give great weight to those of the referee's findings that are supported by substantial evidence. (*In re Cox* (2003) 30 Cal.4th 974, 998 [135 Cal.Rptr.2d 315, 70 P.3d 313]; *In re Johnson* (1998) 18 Cal.4th 447, 461 [75 Cal.Rptr.2d 878, 957 P.2d 299]; *In re Ross* (1995) 10 Cal.4th 184, 201 [40 Cal.Rptr.2d 544, 892 P.2d 1287].) This is especially true for findings involving credibility determinations. The central reason for referring a habeas corpus claim for an evidentiary hearing is to obtain credibility determinations (*In re Scott* (2003) 29 Cal.4th 783, 824 [129 Cal.Rptr.2d 605, 61 P.3d 402]); consequently, we give special deference to the referee on factual questions "requiring resolution of testimonial conflicts and assessment of witnesses' credibility, because the referee has the opportunity to observe the witnesses' demeanor and manner of testifying" (*In re Malone* (1996) 12 Cal.4th 935, 946 [50 Cal.Rptr.2d 281, 911 P.2d 468]).

Though we defer to the referee on factual and credibility matters, in other areas we give no deference to the referee's findings. We independently review prior testimony (*In re Cox, supra*, 30 Cal.4th at p. 998, fn. 2), as well as all mixed questions of fact and law (*In re Ross, supra*, 10 Cal.4th at p. 201). Whether counsel's performance was deficient, and whether any deficiency prejudiced the petitioner, are both mixed questions subject to independent review. (*Ibid.*) Ultimately, the referee's findings are not binding on us (*In re Malone, supra*, 12 Cal.4th at p. 946; *In re Ross*, at p. 201; *In re Marquez* (1992) 1 Cal.4th 584, 603 [3 Cal.Rptr.2d 727, 822 P.2d 435]); it is for this court to make the findings on which the resolution of Thomas's habeas corpus

claim will turn (*In re Visciotti* (1996) 14 Cal.4th 325, 349 [58 Cal.Rptr.2d 801, 926 P.2d 987]; see *In re Scott, supra,* 29 Cal.4th at p. 824).

Thomas vigorously criticizes the referee for adopting verbatim large portions of the Attorney General's proposed findings and suggests the referee's findings are not entitled to deference. On this record, we disagree. As Thomas's own analysis demonstrates, the referee did revise or reject some proposed findings, presumably where he disagreed. We decline to infer that the referee abdicated his responsibility to issue the independent report we requested such that we should vary the standard of review. (See *Anderson v. Bessemer City* (1985) 470 U.S. 564, 572–573 [84 L.Ed.2d 518, 105 S.Ct. 1504].) Consequently, as with any other referee's findings, these referee's findings are entitled to deference precisely to the extent they are supported by substantial evidence; to the extent they are not, or to the extent they touch on mixed questions of fact and law, we will accord them no deference.

## II. *Counsel's Performance*

Thomas contends trial counsel was ineffective for failing to investigate and present the testimony of other persons who could have corroborated Vivian Cercy's account of an unknown blond male, "Bo," who might have committed the murders. Thomas alleges no such investigation was conducted and that witnesses could have been discovered who would have established Bo was a real person, James Bowen, and would have supported the theory that Bowen was the perpetrator.

### A. *Standards for Establishing Deficient Performance*

The burden is on Thomas to demonstrate by a preponderance of the evidence that counsel's performance was inadequate and fell below an objective standard of reasonableness (*In re Gay* (1998) 19 Cal.4th 771, 790 [80 Cal.Rptr.2d 765, 968 P.2d 476]), i.e., that Thomas was deprived of "reasonably effective assistance" (*Strickland, supra,* 466 U.S. at p. 687; accord, *People v. Wade* (1988) 44 Cal.3d 975, 989 [244 Cal.Rptr. 905, 750 P.2d 794]). We assess the reasonableness of counsel's performance deferentially. (*Strickland,* at p. 689; *People v. Mincey* (1992) 2 Cal.4th 408, 449 [6 Cal.Rptr.2d 822, 827 P.2d 388].) We consider counsel's performance from his perspective, analyzing counsel's decisions based on what he knew or should have known at the time. (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1243–1244 [275 Cal.Rptr. 729, 800 P.2d 1159]; *In re Andrews* (2002) 28 Cal.4th 1234, 1253 [124 Cal.Rptr.2d 473, 52 P.3d 656].)

The reasonableness of counsel's performance is assessed according to the prevailing norms at the time. The United States Supreme Court has "declined

to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that 'the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' " (*Wiggins v. Smith* (2003) 539 U.S. 510, 521 [156 L.Ed.2d 471, 123 S.Ct. 2527]; accord, *Rompilla v. Beard* (2005) 545 U.S. 374, 380 [162 L.Ed.2d 360, 125 S.Ct. 2456, 2462].)

In evaluating counsel's performance, we assess both the reasonableness of counsel's decisions and the reasonableness of the investigation that underlay each decision. "[B]efore counsel undertakes to act, or not to act, counsel must make a rational and informed decision on strategy and tactics founded upon adequate investigation and preparation." (*In re Marquez, supra*, 1 Cal.4th at p. 602; accord, *In re Avena, supra*, 12 Cal.4th at p. 722; see also *In re Jones* (1996) 13 Cal.4th 552, 564–565 [54 Cal.Rptr.2d 52, 917 P.2d 1175].) " '[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.' " (*In re Lucas* (2004) 33 Cal.4th 682, 722 [16 Cal.Rptr.3d 331, 94 P.3d 477], quoting *Strickland, supra*, 466 U.S. at pp. 690–691.)

B. *The Defense Investigation*

The referee's findings include the following, supported by substantial evidence and unchallenged by either party: Defense Counsel James Chaffee had copies of the police report from an August 17, 1985, interview with Vivian Cercy and both a tape and written summary of an August 29, 1985, public defender investigator interview with Cercy. In the police interview, one day after the killings, Cercy "stated that sometime Thursday evening she had had an argument with her boyfriend, Harry Shorman, and had drunk 'quite a bit.' She drove with her two small children to a dumpster. While throwing away her trash, Cercy claimed to have seen a white female and two white males possibly arguing. The female was described as about five feet, six inches or five feet, seven inches and stocky. One male was described as being about 23 to 25 years old, clean shaven, with blond hair. Cercy thought the other male was in his late twenties, with dark curly hair and possibly a beard; he might have been wearing overalls. Cercy overheard the blond [man] say, '[W]e need this, this is worth money,' and believed he placed something in

his waistband. She could not tell what it was but thought it might be a revolver or handgun. Cercy was positive the item was not a rifle because of its length.

"Cercy reportedly heard the woman say, '[P]ut it back, I don't want to be part of it,' or words to that effect. She then walked away. Cercy invited the woman to stay in her car but the woman laughed and continued walking down the road. She then believed the blond man said something to the effect of 'I'll take care of this,' and followed the woman. Cercy drove to another location and about 15 minutes later heard what she thought were two or three firecrackers or possibly shots. She drove to where she had seen the people walking but did not see anybody. Cercy then returned to her original location and did not see anything else."

Cercy provided similar information in her August 29, 1985, interview with an Alameda County Public Defender's Office investigator. In that interview, according to the investigator's summary, Cercy said: "[A]t some point on the day of the killings, at a time she could not recall, [she] drove to a dumpster outside Rainbow Village to throw away her trash. She claimed to have seen the victims and a man she called Bo. Cercy described Bo as about six feet tall with blond hair. She stated that Bo was no longer in Rainbow Village and she did not know when he left or where he went. Cercy did not know the names of the murder victims until after the killings but called them Mary and Greg in her statement.

"Cercy thought Bo and Mary were arguing about a long object in Bo's hand. Mary said something to the effect of '[G]ive it back,' but Bo put what looked like a foot-long gun in the front part of his waist band. Mary again said to '[G]ive it back,' but Bo said, 'No, I need this. It could be money for us.' Mary said she did not want any part of it and walked towards University Avenue. Cercy told Mary to get into her car but Mary refused, said she would be all right, and kept walking. Cercy heard Bo tell Greg he would take care of it and walked by Cercy's car. As the man she called 'Bo' passed[,] Cercy asked him his name, but the man kept walking. Cercy thought he was going after Mary.

"Cercy parked along the roadside and about 15 minutes later heard what sounded like three firecrackers going off. She estimated the time as between midnight and 4:00 a.m. Cercy then drove towards University Avenue and back but did not see anyone. A couple of hours later, she saw Bo at the water washing his hands and wiping them on the ground. Cercy drove back to Rainbow Village where she saw Bo washing his hands [again] in a basin just outside the Village. She again parked on the roadway.

"About 20 to 30 minutes later, Cercy heard two male voices, one of which sounded white, talking behind her car. The person with the white voice said, 'Leave her alone; she's got two kids.' A few seconds later there was a knock on the window of the driver's door and Cercy saw a man wearing a pea coat. He asked her name and where she was staying. [Cercy told the man she was staying with Harry Shorman.] When he asked what color bus Harry owned, Cercy asked the man why he was questioning her. The man said he was going to kill her. Cercy immediately blanked the man's face out of her mind and could give no description[,] including the color of his skin. The man walked away without saying anything else."

Chaffee spoke with Cercy about what she had seen and about the man she called Bo. Chaffee had a description of Bo from Cercy: White, blond, tall, thin, and about 25 years old. He recognized that the prosecution's case rested on circumstantial evidence. Thus, Chaffee believed it would be important to corroborate Cercy's story about seeing the possibly armed Bo arguing with Gioia the night of the killings. He believed it would have been helpful to determine whether Bo existed.

Chaffee knew the area around Rainbow Village consisted of two communities: permanent residents and transient visitors. Many of the transient visitors were followers of the Grateful Dead. Chaffee knew both victims were members of the Grateful Dead community, not part of the Rainbow Village community. Similarly, he spoke to people who surmised Bo was tied to the Grateful Dead community. Thus, Chaffee agreed at the evidentiary hearing that it would have been logical to do an investigation in the Grateful Dead community to try to locate Bo.

In conducting his investigation, Chaffee spoke only with Rainbow Village residents; though Chaffee had a description of Bo, he did not know where to look further for him. He did not talk to anyone in the Grateful Dead community. The band had left the area, but Chaffee did not ask anyone how one might go about tracking down Deadheads. He did not know that the band published an itinerary. He knew the band returned to the Bay Area during the pretrial period, but did not send anyone to the concert or concerts to speak with any Deadheads. He did not ask the Alameda County Public Defender's investigations unit to do any investigation, either in the Grateful Dead community or elsewhere. He also did not ask his assisting attorney, Susan Walsh, to do any investigation. Instead, Chaffee conducted his investigation personally, in order to get a feel for the potential value of each witness at trial.

We adopt these unopposed findings concerning the scope of the defense investigation.

## C. *Tactical Justifications for the Scope of the Investigation*

The referee found James Chaffee a "truthful and believable" witness. We accept that credibility finding.

The referee found that Chafee offered the following tactical justifications for the scope of his investigation. Chaffee viewed Cercy's testimony as a "double-edged sword" because she might or might not come across well on the stand, but her testimony would at least "muddy the water" for the prosecution. Chaffee did not look for Bo in the Grateful Dead community because he wanted to try the case on Cercy's testimony. He was uncertain whether Bo existed and believed the state of the record as it stood after Cercy's preliminary hearing testimony could not be improved. While it might have been helpful to know if Bo existed and Cercy's testimony could be corroborated, Chaffee elected to go ahead without corroboration.

Neither side objects to these findings concerning Chaffee's proffered justifications for conducting his investigation in the manner he did, and we adopt them.

## D. *Analysis*

We conclude that under the professional norms prevailing at the time, it was deficient for defense counsel not to make any attempt to confirm the existence of "Bo" by conducting an investigation in the Grateful Dead community.

Chaffee testified that he decided to try the case on Cercy's testimony alone. He made this decision even though Chaffee himself testified he had concerns about Cercy. According to the referee's undisputed findings, about half the time Chaffee believed Cercy was telling the truth, which means that about half the time he thought she might be dissembling. Chaffee was informed that Cercy might be unreliable and was concerned she might not present well on the stand. Indeed, Chaffee's concerns were sufficiently strong that he preferred not finding Cercy and having her preliminary hearing testimony reread at trial to finding her and having her testify live, concluding that the state of the evidence presented in her preliminary hearing testimony was "as good . . . as it would ever be" for the defense.

However, Chaffee's decision to rest the defense case on Cercy's potentially shaky testimony and to not present corroborating evidence was not the product of a reasoned judgment that potentially corroborating witnesses were untrustworthy or problematic and would weaken the case. Chaffee agreed, and the referee found, that additional proof of Bo's existence would have

been helpful. Instead, the decision was a consequence of Chaffee's limited investigation's having yielded no corroboration. Having failed to turn up confirming witnesses in the course of his investigation, Chaffee had no choice but to go it alone with Cercy.

The real issue, then, is whether the investigation leading up to the decision not to present corroborating evidence was itself reasonable. (See *Wiggins v. Smith, supra,* 539 U.S. at p. 523; *In re Lucas, supra,* 33 Cal.4th at p. 725.) Chaffee had an obligation to conduct a reasonable investigation or make a reasonable decision that rendered further investigation unnecessary. (*Strickland, supra,* 466 U.S. at pp. 690–691; *In re Lucas,* at p. 722.) We assess the reasonableness of his decision to limit his investigation according to the prevailing norms at the time, the information available to Chaffee, and Chaffee's actual strategy. (See *Wiggins v. Smith,* at pp. 523–526; *In re Lucas,* at p. 725.)

The American Bar Association Standards for Criminal Justice published at the time described the duty to investigate this way: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore *all avenues* leading to facts relevant to the merits of the case and the penalty in the event of conviction. . . . The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty." (1 ABA Stds. for Crim. Justice (2d ed. 1982 supp.) std. 4-4.1, italics added.) These standards have consistently been relied on by the United States Supreme Court as relevant indicia of the prevailing practice norms. (See *Rompilla v. Beard, supra,* 545 U.S. at p. 387 [125 S.Ct. at pp. 2465–2466]; *Wiggins v. Smith, supra,* 539 U.S. at p. 524.)

At the evidentiary hearing, fellow attorneys in Chaffee's office offered more detail concerning standard practice in death cases at the time. David Andersen was the intake public defender when Thomas was arrested. He submitted an initial request for investigation to the public defender's investigations unit. He testified that use of investigators was routine practice, use of second attorneys to assist in investigation was routine practice, and conducting an investigation into the Deadhead community would have been routine. Dean Beaupre, chief assistant public defender at the time, testified that he would have authorized funding for such an investigation.

As the referee found, and the parties do not dispute, Chaffee conducted no investigation for supporting witnesses or corroborating evidence outside Rainbow Village, despite knowing or having strong reason to suspect that both the victims and Bo came not from Rainbow Village but from the distinct Deadhead community.

We conclude this omission was unreasonable. Chaffee's apparent strategy was twofold: he wanted to cast doubt on the prosecution's circumstantial evidence, including the apparent lack of motive, and he wanted to offer the jury the possibility of an alternate killer. Given this strategy, any evidence adding to the plausibility of the alternate-killer theory would have been critical. Did Bo exist? Did he have ties to the victims? What was the subject of the argument Cercy reported witnessing between Bo and Gioia? Did Bo own or have access to a gun? Given the actual defense strategy, these were crucial questions. Given the knowledge that Gioia and Kniffin were Deadheads who had come to Berkeley for a show, and reason to suspect that Bo (if he existed) was likewise a member of this transient Deadhead community, a reasonable attorney would have made *some* effort to trace Bo in that community.

Chaffee testified that he did not know how to contact anyone in the Grateful Dead community, nor was he aware that the band published an itinerary. However, Chaffee had a description, a nickname ("Bo"), and the resources of the Alameda County Public Defender's investigations unit at his disposal. The office's chief investigator at the time, Thomas Rauch, testified that he could and would have conducted a search with this information as a starting point. Though the Grateful Dead and their followers had left town by the time Chaffee was appointed, Chaffee had the license plate of the "Dead On" bus that had been parked in Rainbow Village the night of the murders and by checking its registration could have identified its owner, Deadhead Randy Turley.[3] Chaffee knew the Grateful Dead had come back to the Bay Area for one or more additional shows in the fall of 1985, presumably bringing with them itinerant Deadheads. Despite this, he never asked an investigator to conduct any search in the Grateful Dead community, nor did he ask anyone more familiar with that community how he might go about tracking down a Deadhead. A reasonable attorney in 1985, charged with representing a capital defendant, would have pursued what leads Chaffee had in the Grateful Dead community, the community from which the victims and Bo came.

Chaffee justified limiting his search for corroborating witnesses to Rainbow Village by explaining that he was unsure Bo existed; he "was not certain he 'wanted to press to[o] hard on whether or not such a person actually existed' " and was afraid he might not find what he was looking for. The difficulty with this explanation is twofold. First, it is inconsistent with Chaffee's seeking corroboration in Rainbow Village. If the proffered justification had been Chaffee's actual tactical reason at the time, he would not have sought corroboration in Rainbow Village either. Once he did so, there was no reason not to also look in the Deadhead community. Second, whatever

---

[3] The referee expressly concluded Chaffee could have discovered Turley in this fashion.

Chaffee's doubts, looking for Bo had no downside, a point Chaffee conceded at the evidentiary hearing. On the one hand, an investigation might have yielded corroborating evidence and demonstrated Bo's existence; on the other, even if Chaffee found nothing, an investigation could not have disproved Bo's existence. Moreover, whether Chaffee failed to investigate or investigated further and found nothing, the prosecution would still have highlighted the absence of corroboration, so not investigating did nothing to insulate the "Bo" theory from attack. Chaffee's concessions that to find Bo or corroboration of Cercy would have been helpful, and that Cercy's testimony was potentially shaky and in need of corroboration, underline the importance of investigating further. In short, the possibility of failure could not justify refusing to investigate, because such refusal guaranteed failure.[4]

As proof of ineffectiveness, Thomas points to Chaffee's decisions to resist the assistance of a second attorney or public defender investigator in preparing for trial. We need not second-guess the procedures Chaffee employed. Different counsel may choose to conduct investigations in different ways, and it is for counsel, not this court, to decide how to obtain the information needed to prepare adequately for trial. (See *In re Hall* (1980) 30 Cal.3d 408, 425 [179 Cal.Rptr. 223, 637 P.2d 690] [declining to criticize counsel for electing to forgo use of trained investigator].) What matters is the substance of the investigation—whether counsel in fact explored those avenues reasonable counsel would have pursued in light of what was known and in light of the chosen defense strategy. It is because Chaffee did not do so, and not because of the manner of his investigation, that we find his performance deficient.

Contrary to our conclusion, the referee found Chaffee had conducted an adequate investigation, accepting Chaffee's tactical justifications as sufficient. However, the ultimate question whether or not Chaffee's investigation was adequate is not one we referred to the referee; our referral was confined to ascertaining what Chaffee did, why he did it, and what he would have found had he done things differently. In any event, a finding on adequacy is a mixed question of fact and law that we review de novo (*In re Ross, supra,* 10 Cal.4th at p. 201),[5] and it is ultimately for this court to make the findings on which the

---

[4] This is not to suggest in any way that every decision to curtail investigation in an area based on the improbability of finding evidence is ineffective assistance. (See *Rompilla v. Beard, supra,* 545 U.S. at pp. 382–383 [125 S.Ct. at p. 2463].) Courts must be careful not to second-guess resource allocation; it is for counsel to decide what leads are or are not worth exploring. Here, however, Chaffee did not offer the need to devote resources to investigation in other more promising areas as a tactical justification for not looking. This is understandable; aside from casting doubt on the prosecution's evidence, trying to offer a credible alternative killer was the main defense. If counsel chooses a given approach as the main defense, then it behooves counsel to conduct a reasonable investigation in that area.

[5] The Attorney General concedes as much and thus concedes that the referee's finding on this question is entitled to no deference.

grant or denial of Thomas's petition must rest (*In re Visciotti, supra*, 14 Cal.4th at p. 349). While the record supports the referee's findings concerning what Chaffee did and why, it does not support the referee's ultimate conclusion that Chaffee's investigation was adequate under prevailing norms.

We conclude that Chaffee failed to conduct a reasonable investigation for evidence to corroborate Vivian Cercy's testimony and support the theory that someone other than Thomas was the actual killer. His decision to proceed with Cercy's testimony alone was a consequence of this unreasonably limited investigation and thus was not a justifiable tactical decision. Consequently, Thomas has demonstrated that his counsel's performance was deficient.

### III.  *Prejudice*

Because defense counsel's performance in at least one respect fell below the line of reasonable practice, we must consider whether counsel's omissions prejudiced Thomas. It is for Thomas to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra*, 466 U.S. at p. 694; accord, *In re Cox, supra*, 30 Cal.4th at p. 1020.) We conclude he has not done so.

In this case, the existence or not of prejudice is a function of three factors: (1) the witnesses and other evidence Chaffee could have located with a reasonable investigation; (2) the value of any testimony those witnesses could have provided; and (3) the strength of the case against Thomas. (See, e.g., *Rompilla v. Beard, supra*, 545 U.S. at pp. 389–393 [125 S.Ct. at pp. 2467–2469] [analyzing prejudice by measuring fruits of a proper investigation against the case actually presented to the jury]; *In re Lucas, supra*, 33 Cal.4th at pp. 733–735 [same].) We address each in turn.

### A.  *The Witnesses a Reasonable Investigation Would Have Yielded*

According to the referee, of the witnesses upon whose testimony Thomas now relies, Chaffee knew or could have discovered the existence of four: Claus von Wendel, Jong Cheol Cho, Lee Andersen, and Randy Turley. Of these, Chaffee contacted only von Wendel.

In contrast, the referee found that Chaffee could not reasonably have learned of the existence of the following potential witnesses before trial: Daniel Adams, Megan Barry, James Berney Royster, David Kohn, Robert Herbert, Toma Cauffield, and Mel Vapour. Furthermore, the referee concluded that Chaffee knew of, but could not have located, potential witness Lee Andersen. Though Thomas objects to these findings, we conclude they are supported by substantial evidence, as discussed below, and we adopt them.

Contrary to the referee's findings, Thomas contends that in addition to Cho, Andersen, and Turley, Chaffee could "easily" have located Adams, Barry, Royster, Kohn, Herbert, and Cauffield.[6] The dissent implies the same. (Dis. opn., *post*, at p. 1281.) In evaluating this assertion, we are mindful that the issue is not whether Thomas's habeas corpus counsel in fact located these witnesses during postconviction investigation, but whether Chaffee could have been expected to locate each one in the limited time available before trial.[7]

*Daniel Adams*: Adams was a traveling Deadhead. At the evidentiary hearing, Adams recounted witnessing, in the days before the murders, a discussion between Gioia and a man he knew as Bo in which Bo seemed controlling and Gioia appeared very upset. He also reported hearing Bo say, "Sometimes a man's got to do what must be done" the morning after the murders, then saw him pack up and leave Rainbow Village in a hurried fashion.

Thomas argues that Chaffee could have found Adams based on a photograph of him appearing in a story in the San Francisco Chronicle. He dismisses as immaterial that Adams falsely identified himself as Dan Reynolds. Adams's false identification of himself underlines the referee's finding that any investigation would have been complicated by the fact members of the Grateful Dead community frequently used only nicknames or aliases. It was not unreasonable for the referee to conclude that, given Adams's use of a false name, Chaffee would not have been able to track him down in advance of trial or learn he had relevant information.

*Megan Barry*: Barry was a Deadhead, living principally in Chico. Barry believed Gioia was Bo's girlfriend, but had no personal knowledge of this fact and could not identify the source of the information; the referee concluded this belief was speculative. Barry disliked Bo immensely and speculated that Bo and/or fellow Deadhead Weston Sudduth might have killed Gioia and Kniffin over a drug transaction.

---

[6] At oral argument, Thomas also criticized Chaffee for failing to follow up with potential witnesses Robin van Heest, Chris Campbell, Jim Prew, Paul Harter, and John Chandler, whose names were contained in initial police investigation reports. Thomas has offered neither testimony nor declarations from these witnesses and thus has failed to make any showing concerning what impact the failure to interview them had. We need not consider them further.

[7] Chaffee was assigned the case in September 1985, six months before the start of trial. In contrast, habeas corpus counsel was appointed in 1987; as of 1997, when habeas corpus counsel filed the instant petition for writ of habeas corpus, he had located and presented declarations from only two of the six witnesses the dissent focuses on, Adams and Kohn. The other four (Turley, Cho, Cauffield, and Herbert) were apparently not located, or the significance of their potential testimony was not appreciated, until sometime between 1997 and 2002, when they testified at the evidentiary hearing.

Thomas asserts that Barry was well known in the Deadhead community and that in a routine investigation her name would have come up frequently as someone to interview. However, as Thomas concedes and the referee found, Barry left Rainbow Village before the murders. Consequently, Barry had no personal or firsthand knowledge concerning the murders nor, for that matter, did she know Bo's real name at the time of the murders. Although Barry testified she met Gioia three months before Gioia died, the referee found this testimony of doubtful credibility, contradicted by testimony from Gioia's sister indicating that Gioia left for California for the first time in July 1985, the month before she died. Thus, even if Barry's name had come up in interviews of fellow Deadheads, nothing would have revealed that she had relevant information about the murders, Bo, Gioia, or Kniffin or that she should be sought out any more than dozens of other Deadheads.

*James Berney Royster*: Royster was a Deadhead and Rainbow Village resident. Royster was asleep in Rainbow Village the night of the murders; his personal knowledge was limited to confirming that a man he knew as Bo was in Rainbow Village at the time of the murders, and relating his perception that Bo's appearances at Grateful Dead shows dwindled between the murders and Thomas's conviction.

After the murders, Royster was afraid to stay in Rainbow Village and stayed with a friend elsewhere. Royster subsequently left the area to tour with the band. He never contacted the police and contacted a defense investigator only after the guilt phase of trial was over.

At oral argument, Thomas suggested Royster was among many witnesses Chaffee could have found by first contacting Deadhead Randy Turley. Indeed, Turley provided the lead that allowed habeas corpus counsel to locate Royster. Habeas corpus investigator James Barnes testified that he found Royster by tracking down Turley in Chico, who gave him Megan Barry's name; talking to Barry, who was in Connecticut and who gave him Marie Marino's name; locating Marie Marino in New York; from Marino, learning the whereabouts of Royster's parents; and from that, finding Royster.

As noted above, the referee found Chaffee could have traced Turley. It is also undisputed Turley was generally knowledgeable about the Deadhead community. The difficulty, however, is that Turley was not in Rainbow Village at the time of the murders and could not know who might have specific useful information. Thus, at most he could have provided Chaffee only with a long list of names or nicknames of members of the community, with no indication which of those on the list might have actual information about the murders. The numerous steps needed to locate Royster demonstrate the cost of such a further investigation. Indeed, considering only these steps

significantly overstates the benefit and underestimates the cost, because Royster was one of the handful of witnesses habeas corpus counsel felt had evidence worth presenting. Thomas offers no evidence that defense counsel could or should have known in advance that Royster had any relevant information and should be sought out in particular. We cannot tell how much time was spent tracking down and interviewing other equally likely potential witnesses based on names provided by Turley, only to determine that they had nothing of use to say or were unwilling to cooperate.

The example of Royster thus illustrates the general problem with one of Thomas's main arguments, that tracking down Deadhead Turley would have given Chaffee an entry into the Deadhead community and should have allowed him to find witnesses such as Barry, Royster, and others. It is one thing to conduct such an investigation, turning over every conceivable stone, in the context of a habeas corpus proceeding. It is another to argue that counsel, provided with a lengthy "cold call"-type list and a few months to prepare, would be constitutionally deficient for failing to have an investigator run through every name on that list, sifting through dross in the hopes of finding a few nuggets of gold, given what little fruit a witness such as Royster could yield.[8] The referee's conclusion that Royster could not reasonably have been located is supported by substantial evidence.

*David Kohn*: Kohn first came to California four months after the murders, in December 1985, for a Grateful Dead show. He eventually shared an apartment in Chico with James Bowen and others. On a trip to and from a Grateful Dead show, Bowen told him he had once "killed his brother over a woman." Kohn did not know what the statement meant.

Thomas asserts that if one could have found Bowen, one could have found his "close companion," Kohn, who could have testified to Bowen's statement. However, as Thomas concedes, this claim depends on an investigation's first making the connection that "Bo," the unknown blond man Cercy saw, was James Bowen, a flesh-and-blood person who left for Chico in the month after the murders. As the referee found, the other witnesses a reasonable investigation could have identified did not know that Bo was James Bowen; thus, the referee concluded there was "no evidence proving that Chaffee could have established at the time of trial that someone known as Bo was named James Bowen." If an investigation could not make the leap from seeking "Bo" to seeking and finding James Bowen, it likely would not turn up Kohn.

*Robert Herbert and Toma Cauffield*: Herbert and Cauffield came to California from New Jersey in 1985, attending a few Grateful Dead concerts along

---

[8] Moreover, the referee found Royster's testimony "generally lacking in credibility."

the way, and moved into an apartment in Chico. They were roommates of James Bowen for a month or so in September 1985. They witnessed a discussion at their apartment between Bo and another Deadhead, Weston Sudduth, who said words to the effect, "How could you do it? How can you sleep with yourself at night?" They did not know to what this referred.

Herbert and Cauffield were never in Rainbow Village. As with Kohn, Thomas's assertion that they could have been located depends on trial counsel's making the Bo-Bowen connection. Moreover, unless counsel made that connection during the brief period immediately after the murders when Bowen was living with Herbert and Cauffield, Herbert and Cauffield could not have been located without an investigator's working backward to identify and visit every place the (apparently transient) Bowen had stayed since the murders.[9] Thomas has not shown a competent investigation would have revealed Herbert's and Cauffield's identities.

*Lee Andersen*: In 1985, Andersen was a Deadhead and an ex-Rainbow Village resident. He was living on the streets of Berkeley, having been expelled from the village for excessive drinking and noise.

Andersen was a potential second eyewitness to one part of the events reportedly seen by Cercy. He was sleeping near Rainbow Village on the night of the murders and testified at the evidentiary hearing that he saw a tall, thin man in a peacoat or trenchcoat approach Cercy's car and speak with her twice. However, the referee found Andersen's testimony generally lacking in credibility and further concluded that his testimony did more to impeach than to corroborate Cercy (notably, although Andersen was in the same area all night, he heard no gunshots).

Thomas asserts that Chaffee could have found Andersen based on information Thomas's girlfriend, Lenise Christy Allen, had about his whereabouts. But Chaffee actually spoke with Allen, obtained this information, and set up a meeting with Andersen, a meeting Andersen failed to attend. Thus, the failure to locate Andersen did not result from Chaffee's failing to explore a lead and was not a consequence of ineffective assistance.

In sum, what Chaffee would have found 20 years ago with a competent investigation is difficult to know. Perhaps he might have found some but not all of these witnesses; if so, which of these or other potential witnesses would

---

[9] Alternatively, Chaffee might have located Herbert, Cauffield, Kohn, or others if he had happened upon the Chico Deadhead community, presumably one of many in California, and decided to canvass that community, but Thomas offers no reason why Chaffee should have known this would be a particularly fruitful line of investigation absent knowledge that Bo/James Bowen had left the Bay Area for Chico.

have been uncovered is even more difficult to determine. Thomas bears the burden of demonstrating that reasonably effective counsel would have located each witness; on balance, he has not done so. We find supported by substantial evidence the referee's conclusions that a reasonable investigation would not have turned up Adams, Barry, Royster, Kohn, Herbert, Cauffield, Andersen, or Mel Vapour.[10] Thus, the failure to locate and obtain testimony from these witnesses was not a prejudicial consequence of the inadequate investigation.

### B. The Testimony Witnesses Would Have Provided

We turn to those witnesses a competent investigation would have located and what testimony they might have provided.

*Claus von Wendel*: Von Wendel lived on a boat near Rainbow Village. During the evidentiary hearing, he testified that he found a bag on his boat the morning of August 16. He looked inside and saw shoes, books, a blanket-like object, and an out-of-state license for a dark-haired male. Later that day, a blond man came to claim the bag. Von Wendel was upset because the man said he had spent the night on the boat and because he had left the bag without permission. When von Wendel described the man to Deadheads James Berney Royster and Marie Marino, they recognized him and said his name was something like "Bo." Von Wendel did not know Bo. At the evidentiary hearing, von Wendel identified two photographs of James Bowen as the man who appeared on his boat.

A defense investigator spoke with von Wendel in 1986 and learned of this incident. The investigator's notes describe the uninvited visitor as a White male but do not include the name Bo; they also indicate von Wendel recalled the name on the license as Bryan or Bryant.

In the same interview, von Wendel also told the investigator of an incident in which Thomas had threatened to kill a woman and her dog. When von Wendel intervened, Thomas appeared to snap, left, and returned with a machete. When Thomas was distracted, von Wendel escaped unharmed. Chaffee made a tactical decision not to call von Wendel, reasoning that calling him would allow the prosecution to introduce this incident. Thomas

---

[10] Vapour, a local filmmaker, taped an interview with Harry Shorman and a woman who may have been Vivian Cercy in the days following the murders. Thomas describes it as "ironic" that Chaffee failed to locate Vapour, but appears not to assert that a reasonable investigation would have located him. In any event, substantial evidence supports the conclusion that Vapour could not have been located.

does not challenge that tactical justification. Thus, the failure to call von Wendel was not a prejudicial consequence of the defense's limited investigation.[11]

*Randy Turley*: As discussed, Randy Turley was a traveling Deadhead. Chaffee could have traced Turley as the registered owner of the "Dead On" bus. However, Turley had no personal information about the murders; as Thomas acknowledges, Turley left Rainbow Village several days before the murders and did not rejoin the Grateful Dead tour until a week or two after. Thus, Turley would not have been able to provide testimony directly corroborating Cercy's account. At the evidentiary hearing, he testified that he knew several people named "Bo," one of whom frequented Grateful Dead shows and, like the person Cercy described, was tall, thin, and blond. Turley did not know whether this Bo was in Rainbow Village at the time of the murders.

*Jong Cheol Cho*: Cho was a traveling Deadhead. The referee found Chaffee knew of Cho, whose name and address were disclosed in a police report. Cho testified that he knew someone named Bo, but no one named James Bowen. Cho identified pictures of James Bowen as the man he knew as Bo. Cho was in Rainbow Village the night of the murders. The morning after, he had a conversation with Bo and another man he knew as Weston about the previous night. Bo said either "I" or "we" "went swimming into the bay last night." In response, Weston jabbed Bo in the ribs and gave him a look. The conversation ended. Cho spoke briefly with police that day, but did not mention the conversation. Cho did not recall seeing Bo again.

The referee's findings concerning von Wendel's, Turley's, and Cho's prospective testimony are supported by substantial evidence, and we adopt them.

### C. *The Case Against Thomas*

Thomas must demonstrate a reasonable probability that the foregoing additional evidence would have made a difference to the jury. In light of the considerable evidence against him, we conclude he cannot do so.

As mentioned above, that evidence fell into four categories: (1) Thomas's ownership of a high-powered rifle that could have been the murder weapon; (2) sightings of him with the victims shortly before their deaths; (3) incriminating statements and actions by Thomas in the days following the murders; and (4) certain additional physical evidence. We summarize that evidence, recounted in full in our opinion on automatic appeal. (*Thomas, supra*, 2 Cal.4th at pp. 505–512.)

---

[11] Thomas criticizes Chaffee for not interviewing von Wendel earlier in his investigation, but makes no showing as to what additional evidence an earlier interview could have yielded. Thus, he has not demonstrated prejudice from any delay.

### 1. *Thomas's ownership of a .44 magnum*

Gioia died from a gunshot to the face; Kniffin died from a gunshot to the neck. A firearms expert described the differing ballistic properties of .44 magnum handguns and rifles. Based on his examination of postmortem photographs of Gioia's wounds, he opined that the exit wound would be normal for a high-powered rifle or shotgun, but was inconsistent with any he had seen made by a handgun.

The prosecution established that Thomas had acquired a Remington .44 magnum Model 788 rifle from Lenise Christy Allen, his girlfriend. The person from whom Allen acquired the Model 788 rifle, Martin Barbena, described its peculiarities. Barbena testified that the rifle had no clip, but could be fired by hand-loading each round into the chamber. The breech was recessed, so a user had to push each round fully into place or there was a chance of jamming. If a bullet were half-in and half-out, it would tend to simply hang; if it were out any more than that, it would fall through the space for the charge clip. On the basis of this testimony, the prosecutor argued that only a person familiar with that model rifle could have committed the murders and hence that Thomas, the owner of the rifle, was the killer.

Thomas Medlin, a Rainbow Village resident, testified that Thomas still had his rifle the night before the murders; he saw Thomas firing it just before sunset on August 15.

### 2. *Thomas's presence with Gioia and Kniffin the night of the murders*

The testimony of several Rainbow Village residents placed Thomas in the company of the victims during the night of the murders.

Jim Prew testified that sometime after 10:00 p.m. on August 15, Thomas, Gioia, and Kniffin were among a group of people that included Prew, Chris Campbell, and Paul Harter, who were drinking beer in Prew's van at Rainbow Village. About 1:00 a.m. on August 16, Prew agreed to drive Campbell to his home in Richmond. All except Kniffin rode along. After dropping Campbell off, the group drove to a convenience store where they bought burritos, beer, and ale. On the way back to Rainbow Village, they picked up Kniffin along an access road near University Avenue, arriving at Rainbow Village about 1:50 or 2:00 a.m. The group stood around drinking for awhile. About 3:00 a.m., Gioia and Kniffin announced they were going to take a walk. Around that same time, Thomas left too without saying where he was going.

Vincent Johnson testified that he spent the hours between midnight and about 2:00 a.m. on the night of August 15–16 visiting with a friend in his bus

at Rainbow Village. Because the friend was afraid to drive on the access road by herself, on her departure Johnson rode along with her as far as University Avenue. After she dropped him off, Johnson walked back to the village alone. Near the landfill office, he saw Thomas with a young White couple. Johnson passed within 15 to 20 feet of them. Thomas was standing and staring into space. He appeared angry.

### 3. *Thomas's statements and conduct after the murders*

Sometime after sunrise on August 16, a body was seen floating in the bay. Berkeley Police Detective Fred Eihl arrived at the Berkeley dump landfill area shortly after 11:00 a.m. Detective Eihl testified that he was standing about 30 feet from the body, which was floating facedown. Some white upper clothing was visible, but neither the face nor the legs could be seen. Thomas was standing about 15 feet behind Eihl, about 45 feet from the body. As personnel from the coroner's office began to remove the body from the water, while the face was still not visible and before Eihl could tell whether the body was male or female, Thomas said, "That's Mary."

Because Thomas had made a tentative identification, Eihl asked him for more information. Thomas told Eihl that he knew the victim only as Mary. Asked when he last saw Mary, Thomas said they had partied the night before in a van just outside the gate. Thomas's account of the party was generally similar to that provided by Jim Prew. Eihl asked Thomas what he did after that. Thomas told him he saw Gioia and Kniffin as he was walking out the dump road from Rainbow Village to Ledger's Liquor Store. Gioia and Kniffin asked him for a match;[12] Thomas stopped to give them one and smoked marijuana with them. He then proceeded to Ledger's, found it closed, and returned to Rainbow Village. He got money and went to various locations to try to purchase marijuana. When it grew light out, he went to a laundromat in the area of University and San Pablo Avenues.[13] After finishing his laundry, he returned to Rainbow Village.[14]

Thomas Medlin testified that after Gioia's body was found, Thomas asked him to hold his gun cleaning kit for awhile. Medlin took the kit and hid it in his car. Later, Thomas asked Medlin to hold his ammunition, but Medlin refused and gave him back both the gun cleaning kit and the container with the ammunition. Thomas told Medlin he had been "dumpster diving" (i.e.,

---

[12] Although Thomas claimed the victims needed a match, a waterlogged book of matches was recovered from Gioia's clothing.

[13] Jim Prew testified that he saw Thomas near the intersection of Marina Boulevard and University Avenue shortly after 9:15 a.m. on August 16, but did not notice Thomas carrying anything.

[14] The total round-trip distance involved in Thomas's narrative was 16.8 miles.

searching for salvageable items) all the previous night and had been back and forth from Rainbow Village into town several times.

On August 17, Berkeley Police Inspector Daniel Wolke interviewed Thomas at Rainbow Village. Thomas's statement generally agreed with what he had earlier told Detective Eihl, with certain discrepancies. In the August 17 interview, Thomas said that Kniffin was not at the party in Jim Prew's van; in the earlier interview, he had said Kniffin was present. Additionally, he described his encounter with Gioia and Kniffin near the landfill office somewhat differently to Wolke than he had to Eihl. When he met Gioia and Kniffin about 1:30 a.m. on his way to Ledger's Liquors, Thomas told Wolke, they asked him for some marijuana and he shared some with them, smoking it in his corncob pipe. He said he also drank beer with them. Thomas claimed he must have lost his pipe at that time. Thomas said he got his laundry from his car about sunrise.

Asked if he owned any guns, Thomas said he had a Remington .44 magnum bolt-action rifle without a clip. When Wolke asked to see the rifle, Thomas told him it had been stolen late Thursday afternoon or Thursday evening (August 15). Thomas showed Wolke a lidded Tupperware container and claimed that the 10 or 11 bullets he kept in it were missing. Wolke asked if Thomas had made a police report or told anyone the gun had been stolen; Thomas said no. Thomas said he had last fired it on Thursday evening.

On August 20, Thomas again spoke with Wolke and gave another account of the events of August 15–16, more detailed than his earlier statements and inconsistent with them in some respects. He told Wolke that just before dark on August 15, he had gone with David Bergman and Melody Medlin, Thomas Medlin's wife, to liquor stores on University Avenue. Thomas purchased ale. After returning to Rainbow Village, Thomas ran into Tracy Scarborough. He and Scarborough drank ale and smoked marijuana in Thomas's car. About 9:00 p.m., Scarborough fell asleep. Thomas joined Gioia, Jim Prew, Chris Campbell, and Paul Harter at Prew's van and drank with them. They were drinking whiskey, and Thomas returned to his car to get a pint bottle of Wild Turkey.

Later in the evening, Campbell asked for a ride to Richmond, so they all got in the van and drove out to Richmond. At the San Pablo Dam Road exit, they went to a convenience store and bought burritos and beer. It was 12:59 a.m. They dropped Campbell off and returned to Rainbow Village, stopping to give Kniffin a ride from University Avenue. They continued to drink together for 15 or 20 minutes. Then Prew said he was tired, Gioia and Kniffin left, and Thomas went back to his car to drop off his pint of Wild Turkey. At that time, Thomas decided to go to Ledger's Liquors to buy some beer.

Walking out past the village, he saw Vivian Cercy's car pointed north along the roadside. He also saw Gioia and Kniffin near the concrete docks. Kniffin called him over to ask him if he had any matches. Thomas gave them some wooden matches in a leather-like pouch with a beaded design of deer mating, which he called "Peruvian love beads." They asked him if he had any marijuana. Thomas said he did and took out a wooden pipe in which they all smoked the marijuana. They also drank beer. Thomas told Wolke he also had a corncob pipe with a broken stem and that he must have left it behind for Gioia and Kniffin or else lost it where they were. While Thomas was with them, Vincent Johnson passed by on his way to Rainbow Village and said hello. Thomas spent a total of less than 10 minutes with Gioia and Kniffin before proceeding to Ledger's Liquors. Finding the store closed, he returned to the village. He got his jacket and $20 from his car. He then walked to various locations in an unsuccessful effort to purchase marijuana. He did not see Gioia and Kniffin on his way. He then returned to Rainbow Village, removed his jacket, got his laundry from his car, and walked to the laundromat at University and San Pablo Avenues. It was about daybreak when he got his laundry out of the car. Asked what time it was when he got to the laundromat and began to do his laundry, Thomas said it was after 6:00 a.m. Wolke asked if he knew when the laundromat opened; defendant said it opened at 7:00 a.m., so he must have done his laundry after 7:00 a.m. While doing his laundry, Thomas went across the street to a bakery and got some coffee. Thomas said he ran into a man named Claude Roseman, who lived at the UC Hotel, and he lent Roseman a dollar.

On his return to Rainbow Village, Thomas stopped by the landfill office and noticed several people there. He then went to his car, opened the rear door, and noticed that his rifle was missing from its case, along with a white Tupperware container that had approximately eleven .44 magnum shells in it.[15]

Wolke told Thomas that the police could not figure out the motive for the murders. Thomas said he could think of plenty of reasons why somebody would want to murder the victims. Wolke said, "Why don't you tell me one?" Thomas paused and then said he could not think of any at the time. Wolke asked if he would be willing to take a polygraph test regarding his missing rifle. Thomas said he would have to think about it and get some legal advice.

### 4. *Additional physical evidence*

Inspector Wolke testified that on August 16, he examined a sand pile north of where Gioia's body had been found and adjacent to the spot where

---

[15] During his August 17 interview, Thomas told Wolke that the thief had taken the ammunition but left the Tupperware case, which Thomas showed Wolke.

Kniffin's body was recovered. He observed two sets of drag marks in the sand and bloodstains on some rocks near the water. Detective Eihl testified to the same observations. A corncob pipe with a broken stem was recovered from the area. Thomas's rifle and the distinctive match pouch he said he had loaned the victims were never found.

In short, though circumstantial, the evidence against Thomas was considerable.

In addition, the prosecution called rebuttal witnesses that cast doubt on Cercy's testimony. Inspector Wolke testified that he interviewed Cercy on August 17 after Harry Shorman, the unofficial mayor of Rainbow Village and Cercy's boyfriend, introduced him to her. She told Wolke that she had "had quite a bit to drink" on the night of August 15. She did not mention seeing a rifle, but said that, while overhearing the conversation she reported, she saw a person stick a 10- or 12-inch object down his waistband. She was positive it was not a rifle. She did not tell Wolke that someone had threatened to kill her. Additionally, Rainbow Village resident Vincent Johnson testified that in September or October 1985, Cercy had told him she "basically hadn't seen anything" on the night of the murders, and everything she had said she was told to say by Shorman.

Against that evidence, a competent investigation would have offered, in addition to Cercy's testimony, Cho's testimony that he knew of a man named Bo who was tall, thin, and blond and who had gone "swimming in the bay" the night of the murders, and Turley's testimony that he too knew of a tall, blond Deadhead named Bo. Neither Cho nor Turley could have provided any corroboration of what Cercy saw the night of the murders, nor could either have offered any testimony that would materially sharpen suspicion that Bo, not Thomas, was the true killer. In short, their evidence would not have made a difference; when compared with the evidence against Thomas, we conclude there is no reasonable probability it would have led to a more favorable verdict.

Our conclusion would not change even if we were to disregard the referee's findings that many of the habeas corpus witnesses could not reasonably have been located or would not have been called had they been found. The sum total of the evidence presented at the evidentiary hearing establishes that a person known as "Bo" existed in the Deadhead community and was one of many Deadheads in Rainbow Village in the days before and after the murders. It does nothing to move from the realm of speculation what Bo's ties were to Gioia, if any, whether he had access to a weapon, whether he had reason to kill Gioia, and—given the absence of foundation for how

Cercy attached the name "Bo" to a person she had never met—whether the blond man others knew as "Bo" was even the person Cercy saw with Gioia the night of the murders.

■ The real difficulty with the potential case against "Bo," however, is that it does absolutely nothing to undermine the case actually presented against Thomas—the fortuitous "disappearance" of his .44 magnum rifle, the multiple witnesses who saw him with the victims, his identification of Gioia the next morning, the repeated inconsistencies in his shifting explanations, and the corncob pipe found at the scene. Put another way, even if listening to the habeas corpus witnesses might in the abstract make one ponder a small possibility that "Bo" *might have* killed Gioia and Kniffin, listening to the prosecution case would have established in a reasonable juror's mind the near certainty that Thomas *did* kill them. We thus conclude that Thomas has not demonstrated a reasonable probability of a more favorable outcome.

### DISPOSITION

Our order to show cause was limited to a single claim of ineffective assistance of counsel. Thomas's other claims and his petition for writ of habeas corpus will be resolved by separate orders, as is our practice. (See *In re Scott, supra*, 29 Cal.4th at p. 829.) The order to show cause as to Thomas's petition is discharged.

George, C. J., Baxter, J., Chin, J., Moreno, J., and Elia, J.,* concurred.

**KENNARD, J.,** Dissenting.—Petitioner was charged with two counts of murder. At trial, he blamed the murders on a man named "Bo." That defense was presented through the preliminary hearing testimony of a single witness. Defense counsel, a deputy public defender, made no reasonable efforts to locate potential witnesses to corroborate that testimony: Refusing the assistance of the public defender's highly experienced staff of investigators, he insisted on undertaking the task himself, but his own feeble efforts were utterly inadequate.

The majority concludes that defense counsel's inadequate investigation violated defendant's right to effective representation. The majority insists, however, that counsel's incompetence did not prejudice petitioner. I disagree. In my view, there is a "reasonable probability" (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 104 S.Ct. 2052]) that the outcome of trial would have been different if defense counsel had conducted a

---

*Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

competent investigation. Therefore, I would vacate petitioner's two murder convictions and the judgment of death.

# I

Murder victims Mary Gioia and Greg Kniffin were "Deadheads," a name used for followers of the Grateful Dead, a popular rock band based in the San Francisco Bay Area. The Deadheads were nomads who followed the Grateful Dead around the country when the band went on concert tours. In August 1985, Gioia, Kniffin, and many other Deadheads were staying in Rainbow Village, a homeless encampment in Berkeley, located next to San Francisco Bay. In the early morning hours of August 16, 1985, Gioia and Kniffin were beaten and shot to death at point-blank range, apparently with a high-powered rifle or shotgun, and their bodies were thrown into the bay. There was no obvious motive for the murders.

Petitioner was not a Deadhead, but he was living in Rainbow Village at the time of the murders. The circumstantial evidence against him at trial was strong but not overwhelming: (1) He was seen with the two victims around 2:30 a.m., shortly before their deaths; (2) he owned a high-powered rifle that could have inflicted the fatal wounds; he was seen using the rifle on the night of the murders, but the next morning he claimed it had been stolen and later that day he said he was worried that it had been used to shoot the victims; (3) he told the police he was with the victims on the night of the murders, and he made somewhat inconsistent statements about his activities that night; (4) police found a corncob pipe near some bloodstains in the sand, not far from where the bodies were found, and petitioner admitted that on the night of the murders he and the victims had used a corncob pipe to smoke marijuana together; and (5) when the police recovered Gioia's body from San Francisco Bay, petitioner exclaimed, "That's Mary," although he was about 45 feet away at the time.

The defense introduced the preliminary hearing testimony of Vivian Cercy, who was unavailable at the guilt phase of petitioner's capital trial. She said that about 1:30 a.m. on the night of the murders, she saw a man and a woman who resembled the murder victims speaking to a man with long blond hair known as "Bo," whose true name Cercy did not know. Bo held an object in his hand, and Cercy heard him ask, "Do you think she's seen anything?" The man who looked like Kniffin replied, "No, she couldn't have." The woman said, "You have to give it back"; Bo responded, "This could mean money to us, we need this." The woman said, "I don't want any part of this, I'm going," and she began to walk away. Cercy invited her to spend the night in Cercy's car; the woman refused. Saying, "I'll take care of this," Bo walked after the woman. About 15 minutes later, Cercy heard noises that sounded

like firecrackers. She later saw Bo walk up the waterfront and wipe his hands on the vegetation growing there; thereafter, Bo washed his hands in a sink at Rainbow Village. Around 4:00 a.m., a man knocked on the window of Cercy's car, asked her who she was and where she was staying, and said he was going to kill her.

The prosecution impeached Cercy's testimony by calling a police officer who testified that when he interviewed Cercy she admitted having quite a bit to drink on the night of the two murders; she did not mention that on that night a man had threatened to kill her. The prosecution also called Vincent Johnson, a resident of Rainbow Village, who testified that Cercy had told him she had seen nothing on the night of the murders, but that she had given a statement to the police because her boyfriend, Harry Shorman, had asked her to do so.

After deliberating for five days, the jury convicted petitioner of one count of first degree murder and one count of second degree murder, and it found true an alleged multiple-murder special circumstance. At the penalty phase, it returned a verdict of death. This court affirmed the conviction on direct appeal. (*People v. Thomas* (1992) 2 Cal.4th 489 [7 Cal.Rptr.2d 199, 828 P.2d 101].)

In 1997, petitioner filed this habeas corpus petition alleging that his trial attorney, Alameda County Deputy Public Defender James Chaffee, had not conducted a competent investigation to locate potential witnesses who could corroborate Cercy's testimony about Bo. This court appointed a referee, Alameda County Superior Court Judge Philip Sarkisian, to conduct an evidentiary hearing on petitioner's claim.

At the evidentiary hearing, Attorney Chaffee testified that he chose to do his own investigation rather than rely on the highly trained investigators of the public defender's office, because this would allow him to talk to potential witnesses and decide if he wanted to use them. To corroborate Cercy's story, he talked to residents of Rainbow Village. The people he spoke to, however, were not Deadheads and knew nothing about Bo. By the time Chaffee spoke to these persons, the Grateful Dead were on tour, and the Deadheads had left Rainbow Village to follow the band. Chaffee made no effort to track down the Deadhead community to look for Bo. This court's referee concluded, "Chaffee did not look for Bo among the Deadheads because he wanted to try the case with Cercy's testimony about a person named Bo. Chaffee was not certain he 'wanted to press to· [*sic*] hard on whether or not such a person

actually existed' in part because he was never certain Cercy had actually seen a person who might be connected with the case . . . . He believed the state of the evidence from Cercy's preliminary hearing testimony was as good as it would ever be for the defense."

At the evidentiary hearing, petitioner presented the testimony of a number of witnesses who, he claimed, could have been located if his trial attorney had conducted a competent investigation, and who at trial could have given corroborative testimony supporting the defense theory that Bo, not petitioner, had killed Gioia and Kniffin. Petitioner asserted that Bo was James Bowen, a man who matched Cercy's description of the person she knew as Bo, and who was in Rainbow Village at the time of the murders. The name of Weston Sudduth, an acquaintance of Bowen's, figured prominently in the testimony of the witnesses. Below, I summarize the testimony of the most significant witnesses at the evidentiary hearing:

1. *Jong Cheol Cho* was a Deadhead who knew murder victims Kniffin and Gioia, as well as two men he knew as Bo and Weston. He identified a photo of James Bowen as being the man he knew as Bo. He spent the night of the murders in Rainbow Village. The next day, he talked to Bo and Weston about Gioia's death. Bo said either that "I" or "we" "went swimming into the bay last night," after which Weston "suddenly jabbed him" in the rib and simultaneously gave him "a look." The conversation abruptly stopped.

2. *Randy Turley* owned the Dead On bus, in which he would drive people to Grateful Dead concerts around the country. He knew someone named Bo who sold tie-dye clothing at Grateful Dead concerts, and he identified a photo of James Bowen as the man he knew as Bo. Although Turley's testimony simply went to corroborating the existence of the man named Bo, his importance to the defense lay in the fact that he was well-known in the Deadhead community, and thus could have assisted the defense in locating potential defense witnesses.

3. *Robert Herbert* came to California in July 1985. After attending some Grateful Dead concerts he and some friends moved into an apartment in Chico, in Butte County. He knew Randy Turley, the owner of the Dead On bus. In late August or early September 1985, a few weeks after the two murders, a man named James Bowen, known as Bo, moved into the apartment where Herbert was living. Herbert remembers a conversation in which a man he knew as Weston asked Bo, "How can you sleep at night? How can you live with yourself?"

4. *Toma Cauffield* moved into a Chico apartment with her boyfriend, Robert Herbert, in early August 1985. In late August, a man named James Bowen, who was known as Bo and sold tie-dye shirts, moved into the apartment. In September 1985, a man named Weston Sudduth came to the apartment. She heard Sudduth yell at Bo: "How could you do it? How can you sleep with yourself at night?" After the incident, Bo became withdrawn and he moved out soon thereafter.

5. *David Kohn* came to California in December 1985, five months after the two murders. In early 1986, he shared an apartment in Chico with James Bowen, whom he knew as Bo. In February 1986, while driving in a car after a Grateful Dead concert, Bowen said women were "evil" and he had "killed his brother over a woman."

6. *Daniel Adams* was a Deadhead. In the days before the two murders, he heard an exchange between murder victim Gioia, who was "very upset," and a man he knew as Bo, who seemed "controlling." On the morning after the murders, Adams heard Bo say, "Sometimes a man's got to do what must be done." Bo then packed and left Rainbow Village in a hurry.

## II

The majority concedes that, with a reasonably competent investigation, the defense would have been able to locate potential witnesses Cho and Turley, but it concludes that the defense would not have been able to find potential witnesses Herbert, Cauffield, Kohn, and Adams. The majority acknowledges that bus owner Randy Turley was a source that could have led to potential defense witnesses, but it points out that at the time of trial, petitioner's trial counsel did not know that "Bo" was James Bowen, and that potential witnesses Herbert, Cauffield, and Kohn were never in Rainbow Village.

I am unpersuaded by the majority's conclusion that a competent investigation would not have led to *any* of the four witnesses I just mentioned. After all, petitioner's habeas corpus counsel, who did not begin his own investigation into locating potential witnesses until eight years after the murders, managed to find nine Deadheads (Cho, Turley, Herbert, Cauffield, Kohn, Adams, and three other witnesses whose testimony was less significant) who were familiar with Bo and willing to testify on petitioner's behalf. Although most Deadheads were known to use illegal drugs and consequently distrusted the police, there is no reason to believe that they would have felt the same way about a criminal defense investigator, especially if they believed that the defense was representing an innocent man charged with murder.

The majority also states that even if a reasonably competent investigation would have located all of the witnesses who testified on petitioner's behalf at

the evidentiary hearing, and those witnesses had been called to testify at petitioner's trial, it is not reasonably probable that the outcome of trial would have been different. I disagree.

The witnesses who testified at the evidentiary hearing would have greatly strengthened witness Cercy's preliminary hearing testimony had they testified at petitioner's trial. They would have established that "Bo" was a real person, not a figment of Cercy's imagination; that Bo was in Rainbow Village on the night of the two murders; and that Bo had an unpleasant talk with murder victim Gioia shortly before her death. And had those witnesses been called at trial, their testimony would have shown that several months after the two murders, Bo admitted killing his "brother" over a woman. The word "brother" in this context could have been a reference to a close companion rather than a sibling, and Bo's statement might have been considered by the jury as an admission of guilt.

Most significant, however, was the testimony of Jong Cheol Cho. He testified that, *during a conversation about the murders the day after they occurred*, Bo said he had gone swimming in San Francisco Bay the previous night, and that Bo then suddenly stopped talking after his friend Weston elbowed him in the ribs. Unless Bo had some innocent reason to go swimming in San Francisco Bay at night (and the majority offers none) and an innocent reason to mention this late-night swim during a conversation about the murders (and the majority offers none), Bo's statement strongly implicates him in the murders of Gioia and Kniffin, whose killer or killers had dumped their bodies in the bay.

When a criminal defendant at trial has been denied the constitutional right to effective representation, reversal is required if there is a "reasonable probability"—that is, a probability "sufficient to undermine confidence in the outcome"—that counsel's incompetence affected the jury's verdict. (*Strickland v. Washington, supra,* 466 U.S. at p. 694.) Here, if the jury had heard the testimony of the witnesses that petitioner presented at the evidentiary hearing, it might nonetheless have convicted him of the two murders and imposed the death sentence. But there is at least a reasonable probability that it would not have done so. Notwithstanding the minimal showing by the defense in support of its claim that Bo rather than defendant committed the murders, the jury deliberated for five days before rendering its verdicts. These lengthy deliberations are a strong indication that the jury found the issue of defendant's guilt to be close and difficult. Had defendant's trial attorney called the witnesses who later testified at the evidentiary hearing, his claim that James Bowen rather than petitioner committed the murders would have been

greatly strengthened, and the jury might well have concluded there was a reasonable doubt about defendant's guilt and declined to convict him of the capital murders.

I would grant the habeas corpus petition and vacate petitioner's two murder convictions and sentence of death.