O’SCANNLAIN, Circuit Judge,
dissenting:
The majority finds Strickland prejudice based on two conclusions: that the case *1107 against Ralph International Thomas was very close and that the testimony of three would-be witnesses would have been “extremely helpful” in corroborating the testimony of key defense witness Vivian Cercy. Maj. op. 1103-04, 1106. Neither conclusion is warranted. The case against Thomas was stronger than the majority suggests, and the insubstantial testimony of those three witnesses would not have sufficiently corroborated Cercy’s testimony or otherwise undermined the State’s case. Thomas is therefore not entitled to habeas relief on the basis the district court gave, and I respectfully dissent.
I
This case was not as close as the majority suggests.
Mary Gioia and Greg Kniffin were killed by gunshot wounds typical of a high-powered rifle or shotgun, but inconsistent with a handgun. Thomas owned a high-powered rifle that, based on its peculiar features, was likely to have been used effectively only by someone familiar with it. Thomas shot the rifle the night before the murders, showing that he indeed knew how to use it effectively. Moreover, Thomas was with the victims soon before they were killed and was visibly angry. His pipe placed him at the crime scene. Thomas changed clothes in the middle of the night. After the murders, his rifle mysteriously went missing, yet testimony suggested that Thomas himself returned the rifle’s case to his car early in the morning after the murders.
Thomas’s statements and other conduct after the murders reflected consciousness of his guilt and raised further suspicion: Thomas was able to identify Mary’s body when it remained partially underwater and before its sex was apparent. After the murders, he asked another Rainbow Village resident to hold his gun-cleaning kit and ammunition. As an alibi, Thomas claimed to have walked 16.8 miles in the middle of the night. That was improbable in itself, and more improbable given that Thomas generally went to bed early (around 9 p.m.). Indeed, police officers assigned to the areas Thomas claimed to have been walking did not recall seeing him. Thomas also gave inconsistent statements to police about whether his ammunition had been stolen, about his interactions with Mary and Greg, and about his pipes. He said that he could think of plenty of reasons why someone would want to murder Mary and Greg, then could not name one.
Not only was the State’s case strong, but Thomas’s defense — based largely upon Vivian Cercy’s testimony — was weak. Cercy’s testimony was imprecise, her answers were meandering and undermined her credibility, and her statements conflicted with each other and with those of other witnesses. Cercy described the man she called “Bo” as brown-haired, then as blond. She testified that the woman she saw arguing (purportedly Mary Gioia) was wearing “dark brown pants,” but the pathologist who performed the autopsy on Mary testified that she wore blue denim shorts and purple pants. One of the police investigators testified that Cercy reported having “quite a bit to drink” on August 15, raising doubts about her perception. Cercy repeatedly testified that she was minding her own business on the night of the murders and therefore was not always paying close attention to what she claimed to have observed. Her testimony was tainted by discussions she had with others, such as the notoriously unreliable “Stagger Lee” Andersen, an oft-intoxicated one-time resident of Rainbow Village. (Andersen was so unreliable that the district court did not credit his testimony.) Cercy’s estimates of the timing of events that night seemed to lack any firm basis. She could give almost no description of a man who *1108 knocked on her window and spoke with her from what was, apparently, only a few feet away. Although she said that this man threatened her life, she did not drive herself and her two young daughters to safety.
In the face of this evidence, it is understandable that six California Supreme Court justices concluded that the State’s case would have “established in a reasonable juror’s mind” — even the mind of one who had heard all the post-conviction record evidence cited by the majority — “the near certainty” that Thomas killed Mary and Greg. In re Thomas, 37 Cal.4th 1249, 39 Cal.Rptr.3d 845, 129 P.3d 49, 67 (2006).
In casting this case as “close,” maj. op. 1103, the majority emphasizes that the jury deliberated for nearly five days and asked for read-backs of testimony, maj. op. 1103. But the majority sidesteps the crucial details. Although the jury deliberated for five days, by the third day it asked about the difference between first- and second-degree murder and by the fourth day it wanted a hard copy of the jury instruction stating the difference between first- and second-degree murder. These “objective clues” (maj. op. 1103) suggest that the jury was focusing on what kind of murder Thomas committed, not on whether he killed Mary and Greg at all. (I note that none of the additional testimony cited by the majority suggests that Thomas should have been convicted of second-degree murder rather than first-degree murder; it suggests only — and feebly — that Thomas was not the killer at all. See infra Part II.) The majority is not justified in casting aside the California Supreme Court’s near-unanimous determination that Thomas was, to a “near certainty,” the murderer.
II
Having pitched the case to be closer than it was, the majority then finds doubt about Thomas’s guilt based on the would be testimony of Jong Cheol Cho, Claus von Wendel, and Randy Turley. Their testimony, the majority maintains, would have been “extremely helpful” in corroborating Cercy’s testimony and supporting the theory that someone called Bo had committed the murders. Maj. op. 1105; see id. at 1105-06.
I cannot agree. To begin with, Cercy’s testimony was essentially beyond corroboration. It is hard to corroborate testimony so imprecise, at times contradictory, and often incredible, from someone who — as even the cold record shows — was not clearheaded, reliable, or perceptive. As Thomas’s current counsel conceded, “Cercy was hardly a dream witness” and “her patterns of speech and thought were obviously eccentric.” That understates the matter.
But even assuming that Cercy’s gossamer-thin testimony was susceptible of corroboration, the three further witnesses’ testimony would not create a reasonable probability of a different guilt-phase outcome. The facts those witnesses may have offered — that a “Bo” existed, that he said he had gone swimming in the bay the night of the murders, and that he left on von Wendel’s boat a bag that contained no murder weapon and only some mundane, common items — do almost nothing to sharpen Cercy’s self-refuting, implausible testimony. Nor do they otherwise undermine the case against Thomas: those witnesses do not refute any of the evidence against him, such as the fact that Thomas owned a rifle that would have been difficult for anyone else to fire and that was quite possibly the murder weapon.
That a “Bo” may have said that he swam in the bay the night of the murders or picked up a bag of run-of-the-mill belongings adds little. Indeed, the swimming-in-the-bay comment may cut against James Bowen’s alleged guilt: If this “Bo” had *1109 killed Mary and Greg, he would presumably have been more careful than to remark to others, hours after dumping the bodies in the bay, that he had gone swimming there. Perhaps the more natural conclusion is that “Bo” was being honest and did not realize that his comment would implicate him. And whether Cho accurately related “Bo” ’s statement is open to doubt. When Cho was pressed about a discrepancy between his sworn declaration and his hearing testimony, he defended the discrepancy by stating, “English is not my native language, and therefore I miss all this.” We should not overturn a jury verdict in heavy reliance upon a single sentence reported through an intermediary who may well not have understood or repeated the sentence accurately.
And the bag on von Wendel’s boat shows almost nothing. Rainbow Village was a place where people came and went — where people slept in their cars, on the ground, and in others’ buses. That someone staying there may have left a bag of shoes, books, a serape, and a driver’s license (and no gun) in an apparently secure spot hardly merits great suspicion. The district court said that items in the bag “corresponded to the shoes and poncho that were missing from Kniffin’s body when it was found.” But Randy Turley testified that “Bo” liked to wear serapes. And it is no surprise that “Bo” would have an extra pair of shoes in a bag containing his belongings. Von Wendel’s testimony — about an article of clothing commonly worn by “Bo” (a serape) and an article commonly worn by most American adults (shoes)— does not corroborate Cercy or undermine the other evidence of guilt.
Finally, I do not understand why the majority disregards the rebuttal testimony of Vincent Johnson. On rebuttal, the prosecutor asked Johnson, “[W]hat exactly did [Vivian Cercy] tell you regarding anything she may have seen [the night of the murders]?” Johnson replied, “She told me, basically, that everything she said was, was — she was told to say by [Rainbow Village resident and Cercy’s on-and-off boyfriend] Harry Shorman, and that she basically hadn’t seen anything, hadn’t seen anything.” Johnson’s testimony makes it all the more difficult to imagine a different result in this case. Even if the three additional witnesses would have established that a “Bo” existed and that Cercy had not “made him up,” Johnson’s rebuttal decisively supported the prosecution’s view that she was not testifying credibly and was acting as a mouthpiece for eccentric grandstander Harry Shorman.[1]
Ill
In sum, the evidence on which the majority relies — Cercy’s narrative, Turley’s confirmation of a “Bo” ’s existence and description, Cho’s testimony that “Bo” made a “swimming into the bay” comment, and the bag on von Wendel’s boat — when set against the actual case against Thomas, does not “undermine confidence in the outcome” of his guilt-phase trial. Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
*1110 I would reverse the district court’s judgment granting a writ of habeas corpus.

. The majority says that, during habeas proceedings, Thomas submitted a declaration in which Johnson at least partially recanted his testimony. Maj. op. 1105 n. 14. The declaration is more equivocal than the majority suggests and, in any event, Johnson testified later that he was not lying when he testified that Cercy had told him that '‘everything she said was” what she "was told to say by Harry Shorman” and that "she basically hadn't seen anything.” The majority states that it "need not consider the effect of that declaration here.” Id. But if the majority "need not consider” that later declaration, it is unclear why the majority is justified in effectively disregarding Johnson’s rebuttal testimony in considering Strickland prejudice.