Filed 4/27/21  P. v. Johnson CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>CECIL JOHNSON et al.,<br><br>        Defendants and Appellants. | B300636<br><br>(Los Angeles County Super. Ct. Nos. BA393960-01, BA393960-02)<br><br>ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on March 30, 2021 be modified as follows:

1.  On page 4, in the second full paragraph, the sentence commencing with:  "The defendant bears the burden of proving" is deleted and replaced with the following:  "The prosecution bears the burden of proving the defendant was charged with a violent felony and one of the prior dismissals was due solely to excusable neglect.  (*Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 747 (*Miller*).)  "Where a criminal defendant

raises official misconduct as a defense, he or she bears the burden of proof on this issue." (*Id.* at p. 748.)

2. On page 8, in the first full paragraph, the second sentence "By November 2011, Benavides knew of a specific building where Gregory may be residing, but not the exact address" is deleted and the following sentences are inserted in its place: "In July 2011, Benavides had an idea of Gregory's whereabouts, but he did not know specifically where she was. In November 2011, Benavides met with one of Gregory's family members in Los Angeles and had telephone calls with Gregory's mother, who would not reveal Gregory's address."

3. On page 8, in the third full paragraph, after the first sentence commencing with "On January 31, 2012," add: "Prior to that date, Benavides received information from Gregory's family as to where she might be. He was making arrangements to confirm the information to serve her with a subpoena. Benavides had the location of the building, but not the exact address, which was quite some distance away."

4. On page 10, in line four, delete "lying to" and replace with "falsely inform[ing]" in quotation marks.

5. On page 11, delete the first full paragraph commencing with "Handicapped by defendants" and ending with "which the record is silent' "].)

6. On page 11, the first sentence of the second full paragraph is modified to read: "Third, we are unpersuaded by Bailey's assertion a dismissal for excusable neglect requires *both* the prosecutor and the police to have acted with due diligence."

7. On page 12, line 7, following the sentence ending with, "and the prosecutor in making its findings," insert: "Following defendant's reasoning, whenever the police act with inexcusable

2

neglect or in bad faith in this type of situation, the prosecutor must have also acted with inexcusable neglect or in bad faith."

There is no change in the judgment.

The petition for rehearing is denied.

NOT TO BE PUBLISHED.

_____

SALTER, J.*              EDMON, P. J.              LAVIN, J.

---

* Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 3/30/21  P. v. Johnson CA2/3 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.6

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>CECIL JOHNSON et al.,<br><br>        Defendants and Appellants. | B300636<br><br>(Los Angeles County<br>Super. Ct.<br>Nos. BA393960-01,<br>BA393960-02) |

APPEAL from judgments of the Superior Court of Los Angeles County, Mary Lou Villar de Longoria and Frederick N. Wapner, Judges.  Affirmed in part, reversed in part, and remanded with directions.

Spolin Law, Aaron Spolin and Caitlin Dukes for Defendant and Appellant Cecil Johnson.

Shannon Chase, under appointment by the Court of Appeal, for Defendant and Appellant Devonte Lamar Bailey.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Scott A. Taryle and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendants Cecil Johnson and Devonte Lamar Bailey of gang-related, first degree murder and found true firearm-use and gang allegations. On appeal, defendants contend the trial court erred in finding one of two earlier dismissals was justified by excusable neglect, thus entitling the prosecutor to refile the case.

Johnson separately contends his conviction was not supported by substantial evidence and the trial court erred by ruling the preliminary hearing testimony of two witnesses was admissible at trial because they were unavailable. Bailey also contends his trial counsel provided ineffective assistance, Proposition 57 violates equal protection, and he was not permitted a *Franklin* hearing. (See *People v. Franklin* (2016) 63 Cal.4th 261.)

We affirm the judgment of convictions. However, we reverse the sentencing and remand the matter to the trial court to correct certain sentencing errors and provide Bailey with a *Franklin* hearing.

## BACKGROUND

Defendants and Leonides Yama were members of the East Coast Crips gang. Yama's gang moniker was Ray Dawg. On April 5, 2010, Ray Dawg was gunned down on the street. Shortly thereafter, Taishawn Wallace was shot and killed while driving his white truck in gang territory. The truck crashed into another vehicle and a building. Wallace's murder appeared to have been committed in retaliation for Ray Dawg's murder, even though Wallace was not a gang member.

There were no percipient witnesses.  But defendants were implicated in Wallace's murder by Johnson's friend, Dominque Gregory, and Bailey's cousin, Eric Atkins.  Gregory told the police that Johnson possessed a handgun, and shell casings found by the police near the location of Wallace's killing matched his weapon.  Atkins told the police that Bailey admitted shooting a man in a white truck before it crashed and then said Johnson was in the backseat acting as a lookout.

The police relocated Gregory out of state.  She appeared at the preliminary hearing and testified that Johnson admitted shooting someone because "they killed Ray Dawg."  Although she later returned to Los Angeles, she could not be found to testify at trial, so her preliminary hearing testimony was read into the record.

Atkins testified at the preliminary hearing and recanted the statements he had made to the police.  The police initially could not find him for trial, so his preliminary hearing testimony was admitted into evidence.  When Atkins was later found, he testified at trial and again recanted the statements he made to the police.

## DISCUSSION

## I.    Defendants' Penal Code[1] Section 1387 Motion to Dismiss

This case involves two dismissals due to the prosecutor's inability to proceed to trial.  When the case was filed a third time, defendants moved to dismiss it as barred by section 1387's two-dismissal rule.  The prosecutor opposed the motion, arguing that

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

3

the section 1387.1 exception applied.  The court agreed with the prosecutor and denied the motion on the ground that one dismissal was due to excusable neglect.  Defendants challenge the trial court's ruling.

### A.    *Applicable Law*

Section 1387, subdivision (a) provides that a second dismissal of a felony action is a bar to a third prosecution for the same offense.  Section 1387.1 creates an exception to the two-dismissal rule, and permits a third filing, where the action involves a "violent felony" as defined in section 667.5, and where either of the prior dismissals was "due solely to excusable neglect" and the conduct of the prosecution did not "amount[ ] to bad faith."[2]  (§1387.1, subd. (a).)  The exception was "designed to save serious-felony prosecutions from improvident loss."  (*People v. Woods* (1993) 12 Cal.App.4th 1139, 1157.)

" '[E]xcusable neglect' includes, but is not limited to, error on the part of the court, prosecution, law enforcement agency, or witnesses."  (§ 1387.1, subd. (b).)  Even if there is excusable neglect on the part of one of these entities, in no case is a third filing permitted when the prosecution's conduct amounts to bad faith.  (§ 1387.1, subd. (a); *Tapp v. Superior Court* (1989) 216 Cal.App.3d 1030, 1035.)  The defendant bears the burden of proving bad faith and rebutting the presumption the prosecution properly refiled charges under section 1387.1.  (*Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 747–748 (*Miller*).)

---

[2] Section 667.5, subdivision (c)(1) lists murder as a " 'violent felony.' "

4

**B.** *Standard of Review*

The parties agree that a court's decision to grant or deny a motion to dismiss under section 1387 is reviewed for abuse of discretion. (See, e.g., *Miller, supra,* 101 Cal.App.4th at pp. 740–741 [standard of review is abuse of discretion; "reviewing court cannot disturb an exercise of discretion unless it is 'arbitrary, capricious, or patently absurd' "]; *People v. Massey* (2000) 79 Cal.App.4th 204, 211 [trial court's decision "should be afforded great weight unless clear abuse of discretion is demonstrated"]; *People v. Woods, supra,* 12 Cal.App.4th at p. 1149 ["application of section 1387.1 is a discretionary decision for the judge which should be afforded great weight . . . . We do not exercise ' "independent review" ' "].) Further, courts recognize that under 1387.1, " '[u]nless *inexcusable* neglect is clear, the policy favoring trial on the merits prevails.' " (*Massey*, at p. 211; see *Woods*, at p. 1154].)

But the California Supreme Court's decision in *People v. Cromer* (2001) 24 Cal.4th 889 lends considerable support to the idea that appellate courts should utilize the independent standard of review where a trial court has applied the 1387.1 exception to a 1387 motion to dismiss based on the unavailability of a witness.

Even though *Cromer* was considering the appropriate standard of review for a trial court's determination of due diligence under Evidence Code section 1291, it concluded "that appellate courts should independently review a trial court's determination that the prosecution's failed efforts to locate an absent witness are sufficient to justify an exception to the defendant's constitutionally guaranteed right of confrontation at trial. . . . [citation] . . . 'Independent review is . . . necessary if

5

appellate courts are to maintain control of, and to clarify, the legal principles.' [Citation.] [¶] Our conclusion that a trial court's due diligence determination is subject to independent review comports with this court's usual practice for review of mixed question determinations affecting constitutional rights." (*Cromer*, at p. 901, fn. omitted.) *Cromer* explained that the trial court's resolution of any factual disputes is reviewed under a deferential, substantial evidence standard (*id.* at pp. 894, 902; accord, *People v. Seijas* (2005) 36 Cal.4th 291, 304), but "once a trial court through its findings has determined the historical facts, it is no better situated than an appellate court to make the predominantly *legal* determination that those facts do or do not demonstrate prosecutorial due diligence in locating the absent witness." (*Cromer*, at p. 902.)

To be sure, *Cromer* emphasized that the issue before it involved the constitutional right to confront witnesses, and many of the independent review cases it cited also concerned questions of constitutional significance. But the Supreme Court has not limited independent review to mixed law and fact cases concerning constitutional rights. It has applied that standard of review to "a diverse array of mixed law and fact questions," including those that are ' "predominantly legal." ' " (*People v. Ault* (2004) 33 Cal.4th 1250, 1264, fn. 8.)

We conclude therefrom that in this case the sufficiency of the prosecutor's unsuccessful efforts to bring Gregory to court is a mixed question of law and fact. The facts are what those efforts entailed; the legal issue is whether the failure to bring her to court was excusable neglect. The *Cromer* and *Ault* reasoning supports the application of the independent standard of review to the court's ruling in this case and in all cases in which a trial

6

court determines that the prosecutor's failure to secure the presence of a witness for trial was due to "excusable neglect" within the meaning of section 1387.1. (See *People v. Ault, supra*, 33 Cal.4th at p. 1267; *People v. Cromer, supra*, 24 Cal.4th at p. 901; *Ornelas v. United States* (1996) 517 U.S. 690, 697.) Given *Cromer* dealt with the substantially similar issue of whether the prosecutor exercised reasonable diligence to bring an absent witness to court, which is subject to independent review, applying the more deferential abuse of discretion standard here would seem anomalous. (See *People v. Massey, supra*, 79 Cal.App.4th at p. 211.)

### C. *Evidentiary Hearing on the Motion to Dismiss*

The case against defendants was initially filed in April 2010. That September, Detective Julio Benavides helped relocate witness Gregory to a new residence 1,500 miles away. He knew her telephone number and they kept in touch. Gregory testified at the preliminary hearing on October 19, 2010.

However, around April 2011, Benavides lost contact with Gregory. Her telephone number was disconnected, and his attempts to reach her through family members were unsuccessful.

On the June 22, 2011 trial date, the assigned deputy district attorney requested a continuance because she was beginning another trial. The felony master calendar court agreed to trail this case until July 5, 2011. On that date, the prosecutor asked for another continuance, acknowledging she was still seeking a gang expert. The court agreed to trail the case to July 6, 2011, when the prosecutor answered ready for trial, and the case was transferred to a trial court. The prosecutor informed the trial court she needed to make travel arrangements

for a custodian of telephone records and would eventually obtain a gang expert. The prosecutor suggested that the trial could commence and, after the prosecution witnesses had testified, the court could grant a brief continuance for the custodian of record's flight to arrive. The court declined, and the prosecutor announced she was unable to proceed without the custodian of records. The case was dismissed and immediately refiled. A preliminary hearing was held under Proposition 115, and a trial date was set for January 31, 2012.

In the meantime, Benavides, with the assistance of Detective Richard Arciniega, continued to try to reach Gregory by telephone and through her family members in Los Angeles. By November 2011, Benavides knew of a specific building where Gregory may be residing, but not an exact address.

On January 12, 2012, subpoenas were faxed directly to Benavides to be served on Gregory. Starting around January 16, 2012, the prosecutor began calling Benavides weekly, who said he was in contact with Gregory.

On January 31, 2012, the trial was continued to February 15, 2012, because the prosecutor was engaged in another trial.

Around February 13, 2012, Benavides arranged to travel out of state to subpoena Gregory. He did not make flight reservations, because he did not have confirmation that the trial would proceed.

On February 14, 2012, the prosecutor again moved for a continuance because she was to begin the trial of a codefendant in the earlier case. Her request was denied, as was her request to her supervisor for the case to be reassigned. That day, the prosecutor learned Benavides had lost contact with Gregory, and

he no longer knew where she was living. From his prior assurances, the prosecutor understood Benavides had been in contact with Gregory since October 2010. On February 15, 2012, the prosecutor announced she was unable to proceed, because Gregory could not be located. The case was dismissed and filed a third time.

### D. *Court's Findings*

The court denied the defense motion to dismiss, finding the section 1387.1 exception applied. The court explained the first dismissal resulted from inexcusable neglect. The prosecutor failed to have witnesses available or to take steps to secure witnesses for trial.

The court found the second dismissal was due to excusable neglect. The prosecutor had subpoenas for Gregory sent to Benavides well in advance of the second trial date and was told by him that he was in contact with Gregory. The prosecutor did not learn that Gregory's whereabouts were unknown until the eve of trial. The court also found the prosecutor reasonably relied on Benavides to maintain contact with Gregory, notwithstanding the fact she could have done more to ascertain Gregory's availability.

### E. *Denial of the Section 1387 Motion to Dismiss Was Not Error*

Defendants specifically attack the findings as not supported by substantial evidence. Bailey expands upon this claim. He argues the lower court erroneously failed to consider both the detectives' and the prosecutor's conduct in making its findings (citing *Miller, supra*, 101 Cal.App.4th at p. 741), focusing instead solely on the prosecutor's conduct, which he argues was in bad faith. Mindful, perhaps, that this court cannot make

9

findings of fact, Bailey suggests as an alternative to reversal, that we either remand for the lower court to "reassess the [second] dismissal" or read into the court's express findings the implied finding Benavides acted with inexcusable neglect by "lying" to the prosecutor.

Defendants' arguments fail for three reasons. First, a review of the record shows neither Bailey nor Johnson objected to the lower court's failure to make express findings whether Benavides acted with excusable neglect or requested such findings. (See *People v. Stowell* (2003) 31 Cal.4th 1107, 1114 ["with certain exceptions, an appellate court will not consider claims of error that could have been—but were not—raised in the trial court"]; *People v. Peel* (1993) 17 Cal.App.4th 594, 600 [defendant who fails to request findings, or fails to object to failure to make findings, forfeits right to raise issue for first time on appeal]; *People v Scott* (1994) 9 Cal.4th 331, 352–353 [failure to object denies trial court opportunity to correct alleged sentencing error].)

Second, the lack of such findings is likely due to the fact defendants were claiming the prosecutor, rather than the detectives, were acting with inexcusable neglect or in bad faith. Defendants' written section 1387 motion is not part of the record on appeal. In the prosecutor's opposition she describes the efforts of Benavides and Arciniega in attempting to locate Gregory. However, she argues the "negligent omission leading to the second dismissal was the failure of the People in relying upon the Investigating Officers to stay in contact with . . . Gregory before [the second trial date]." During argument on the motion to dismiss, Bailey's counsel maintained, "the crux of the court's decision" is the issue of bad faith, arguing the prosecutor

10

"turn[ed] a blind eye to the actions of [the detectives]." Johnson's counsel argued the prosecutor acted in bad faith in seeking the first dismissal by blaming it on the inability to secure the attendance of less important witnesses, when she actually knew Gregory, a key witness, could not be found.

Handicapped by defendants' failure to include their dismissal motions in the record, we can only assume the lower court's express findings addressed all the issues raised in their motions. (See *Stasz v. Eisenberg* (2010) 190 Cal.App.4th 1032, 1039 [appellant's burden to present a complete record on appeal]; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [" 'A judgment or order of the lower court is *presumed correct*' " and " '[a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent' "].)

Third, Bailey's assertion a dismissal for excusable neglect requires *both* the prosecutor and the police to have acted with due diligence is a misstatement of the law. For support, Bailey relies on a quote originating in *People v. Massey, supra,* 79 Cal.App.4th at page 209, in which a magistrate mistakenly denied the prosecution's motion under section 1387.1 by requiring proof of actual negligence or error in failing to secure witnesses' attendance at trial. In concluding the magistrate had construed the term excusable neglect too narrowly, our colleagues in Division Six, after noting the evidence was undisputed that the detective *and* district attorney investigator made numerous attempts to locate and/or serve witnesses with subpoenas, agreed with the People's argument that " 'if the police and prosecution had done all that could be reasonably expected to locate their witnesses and get them to court, and yet not succeeded, then, so far as concerns the construction of section 1387.1, their failure

11

should still be labeled *excusable neglect*, despite the absence of any actual *neglect*, as commonly understood to include an element of carelessness or lack of sufficient regard or effort.' " (*Massey*, at p. 211.)  It is this sentence that defendants seize upon, divorced from its context, to argue the lower court was obligated by law to consider the conduct of both the detectives and the prosecutor in making its findings.  However, that view is contrary to a plain reading of section 1387.1, subdivision (b) which, as discussed, states in the disjunctive, as "used in this section, 'excusable neglect' includes, but is not limited to, error on the part of the court, prosecution, law enforcement agency, or witnesses."  Accordingly, we reject Bailey's interpretation of section 1387.1 and decline his invitation to consider the lower court's express findings as providing implicit findings of Benavides's inexcusable neglect.  Instead, we turn to the merits of defendants' claim and the subject of the court's findings— whether the prosecutor's actions were inexcusable neglect or bad faith.

In deciding whether the prosecutor's neglect was excusable, we look to (1) the nature of the mistake or neglect; and (2) whether the prosecutor was otherwise diligent.  (*People v. Woods, supra,* 12 Cal.App.4th at p. 1149.)  The nature of the neglect here was the prosecutor's reliance on Benavides's assurances he had been in contact with Gregory to subpoena her for the second trial date.  Upon our independent review, we agree with the lower court that the prosecutor's reliance was reasonable.  The prosecutor was aware Benavides had helped relocate Gregory out of state and was in contact with her before and after the preliminary hearing.  Benavides knew Gregory's new address and telephone number.  The detective also knew the

trial dates for this case. While engaged in other trials and preparing for this one, it was reasonable for the prosecutor to assume the detective had maintained contact with one of her key witnesses, whom he had previously assisted. Moreover, because Gregory came to court for the preliminary hearing, the prosecutor had no reason to believe she would not also testify at trial, having not heard otherwise from Benavides.

The prosecutor was otherwise diligent. On January 12, 2012, before the scheduled trial date of January 31, 2012, the prosecutor faxed subpoenas for Gregory to the detectives but did not obtain a receipt. This was not her usual practice, but she was apparently following the detectives' directive for subpoenaing this particular witness. The prosecutor also called Benavides weekly and was told he was in contact with Gregory. Contrary to Bailey's argument, finding the prosecutor's neglect was excusable was not contingent upon finding that Benavides repeatedly lied. Rather the issue was whether her acceptance of his representations under the circumstances was reasonable. We conclude it was.

Defendants failed to demonstrate the prosecutor's conduct amounted to bad faith. While the prosecutor mistakenly relied exclusively on the detective's assurances of Gregory's availability, nothing in the record suggests the prosecutor acted with the purpose or intent to cause harm to defendants, or with a conscious disregard of their welfare, with full knowledge of the negative consequences of her actions. (*Miller, supra,* 101 Cal.App.4th at p. 744.) True, the pressures of being assigned and having to prepare for more than one violent felony trial may have contributed to the prosecutor's neglect. But there was no hint of

13

prosecutorial harassment or an intentional mishandling of the process to annoy or vex defendants.  (*Id.* at pp. 744–745.)

The motion to dismiss was properly denied.

## II. The Admissibility of the Preliminary Hearing Testimony of Gregory and Atkins

Before trial commenced, the prosecutor moved to admit Gregory's and Atkins' preliminary hearing testimony on the ground that they were unavailable because they could not be located.  Defendants objected, and Johnson requested a due diligence evidentiary hearing. Following the hearing, the trial court ruled the prosecution had not exercised due diligence and denied the motion as to both witnesses.  The court found serving Gregory with a subpoena on May 11, 2012, and attempting to follow-up with telephone calls was insufficient.  The court also found that the prosecution failed to take immediate steps after the October 19, 2010 preliminary hearing to ensure Atkins's presence at trial and lacked initiative in pursuing obvious leads after starting to look for him on April 19, 2012.

During jury selection, the prosecutor again sought to admit the preliminary hearing testimony.  Over defendants' objections, the trial court held a second due diligence evidentiary hearing. Prosecution witnesses testified concerning efforts to locate Gregory and Atkins since the June 28, 2012 ruling.  At the conclusion of the hearing, the court found their efforts demonstrated reasonable diligence and permitted the preliminary hearing testimony of Gregory and Atkins to be used at trial.

Johnson contends this ruling violated his constitutional right to confront witnesses against him.  (See U.S. Const. 6th Amend. ["In all criminal prosecutions, the accused shall enjoy the

14

right . . . to be confronted with the witnesses against him"]; *Crawford v. Washington* (2004) 541 U.S. 36, 53–54 [confrontation clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination"].) Specifically, Johnson contends the prosecution failed to exercise reasonable diligence in attempting to secure Gregory's and Atkins's presence at trial.

## A. *Applicable Law*

Evidence Code section 1291, subdivision (a)(2), allows the use of former testimony if the witness is unavailable and the party against whom the former testimony is offered was a party to the proceeding in which the former testimony was given and had the right to confront and cross-examine the now-absent witness "with an interest and motive similar to that which he has at the hearing." (See *People v. Carter* (2005) 36 Cal.4th 1114, 1172; *People v. Wilson* (2005) 36 Cal.4th 309, 341.) The proponent of the evidence, here the prosecution, has the burden of establishing unavailability. (*People v. Herrera* (2010) 49 Cal.4th 613, 623.) That burden is met when the witness is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) "The term '[r]easonable diligence, often called "due diligence" in case law, " 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' " ' [Citation.] Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' " (*Herrera*

15

at p. 622.) "[T]o establish unavailability, the prosecution must show that its efforts to locate and produce a witness for trial were reasonable under the circumstances presented." (*Id.* at p. 623.) Where the relevant facts are undisputed, we independently review a trial court's determination of due diligence. (*People v. Fuiava* (2012) 53 Cal.4th 622, 675.)

### B. *Atkins's Trial Testimony Rendered Moot the Issue Whether His Preliminary Hearing Testimony Was Properly Admitted*

Two weeks after his preliminary hearing testimony was read to the jury and the prosecutor had completed her case in chief, Atkins appeared in court following his arrest for a probation violation. The prosecutor asked to reopen so Atkins could testify. Johnson objected. The court overruled the objection. Johnson then moved to strike Atkins's preliminary hearing testimony.[3] The court denied the motion. Atkins was appointed counsel and testified.

Because Atkins testified at trial, the issue of the admissibility of his preliminary hearing testimony is moot. His trial testimony was virtually the same as his preliminary hearing testimony in which he claimed to have lied to the police about defendants' involvement in Wallace's killing. During both court appearances, Atkins was subjected to vigorous cross-examination and defendants' motive in cross-examining him each time was the same—to demonstrate to the jury the credibility of Atkins's

---

[3] Bailey's counsel did not ask that Atkins's preliminary hearing testimony be stricken and stated he would have Atkins testify in Bailey's defense if the prosecutor was precluded from reopening her case-in-chief.

16

testimony as opposed to his statements to the police. We, therefore, need not address whether Atkins's preliminary hearing testimony was properly admitted and turn instead to the admissibility of Gregory's preliminary hearing testimony.

### C. *Evidence of the Prosecution's Efforts to Locate Gregory*

After Gregory was served with a subpoena on May 11, 2012, district attorney investigator Thomas Snook called her telephone number. A woman, who identified herself as Gregory, answered and said she had received the subpoena and intended to appear at trial. She also confirmed her telephone number and residence address. When Gregory failed to appear on May 30, 2012, as subpoenaed, the court issued a body attachment on that date.

Snook was aware Gregory had relocated, possibly out of state, but had since returned to the Los Angeles area. He determined Gregory was currently associated with several local addresses: The residence in Los Angeles, where she was listed as receiving welfare benefits; a house of worship where Gregory attended services; an address in Compton, which Gregory used when she last reported to the probation department's kiosk on June 29, 2012; a hotel in Los Angeles, where she had once resided; and an address in Carson, which was the residence of the father of one of her children.

An attempt to serve Gregory at the Los Angeles residence was unsuccessful. She was not there. Neighbors confirmed it was her residence but said she had not been seen in weeks. Snook checked back on six different days from June 29 through July 16, 2012. He left his card and asked neighbors to call him if they saw her. No one called. On July 12, 2012, Snook noticed

17

some of Gregory's mail had been removed from her mailbox and there was a postcard reminding her of a WIC appointment for 8:15 a.m. on July 13, 2012.  On that date Snook waited one hour and 45 minutes for Gregory at the WIC office.  She never appeared.

Gregory was not at the address when her mother visited from out of state, June 20 through 27, 2012, though her mother did reach Gregory by telephone.  Snook repeatedly called Gregory's number but received no answer.  The telephone was disconnected by July 10, 2012.  He also repeatedly called and left messages for Gregory's mother but never heard back.

On July 1 and 2, 2012, investigators went to Gregory's place of worship and found the building closed and locked.  No one responded to their calls to the pastor.

On July 3, 2012, Snook went to the Compton address, which was vacant.  The owner of the property told Snook that the renter, who was not named Gregory, had moved to an unknown location after not paying rent for six months.

On July 3, 2012, Snook also went to a hotel where Gregory was reportedly seen one month earlier.  No one had signed in under the name Gregory in April or May 2012, but it was possible to gain access to the building anyway.  Snook checked back two days later; Gregory was not there.

An investigator went to the address of Gregory's childcare provider listed with the Department of Social Services (DSS).  A man that identified himself as the uncle of both Gregory and the childcare provider said neither niece lived there.  He did not have a telephone number or address for Gregory.

Investigators tracked Gregory's welfare benefits and discovered she had used her EBT card on July 2, 2012, to make a

purchase at grocery store and withdraw cash from a bank in Carson. Snook went to the Carson residence of the father of one of Gregory's children. The grandfather came to the door, checked inside the house, and said Gregory was not there. Snook then spoke to the father who became belligerent. Father insisted Gregory was not there, they were no longer together, and he did not know where to find her. Father said Gregory did not want any part of the case and if Snook found her, she would not testify. Snook checked the vehicles in and around the residence and found none were registered to Gregory. On July 16, 2012, he surveilled father's residence for 45 minutes, with no results. The other known father of one of Gregory's three children lived in Lancaster, and his telephone was disconnected.

Investigators repeatedly checked police and arrest records, hospitals, and the coroner's office, but they were unable to locate Gregory. Snook contacted the Employment Development Department (EDD) and learned Gregory was not employed. Investigator Henry Valdez assisted Snook by conducting data searches for Gregory's addresses, telephone numbers, possible relatives, prior arrests, and utilities. These searches produced nothing new.

Investigators gave wanted bulletins for Gregory to the watch commander of the Carson sheriff's station and spoke to Gregory's sister and aunt. They did not know where to find her.

### D. *Trial Court's Findings*

The trial court ruled the prosecution exercised due diligence in attempting to secure Gregory's and Atkins's presence at trial.

As pertinent here, for Gregory, the court found the time for exercising reasonable diligence began when she failed to appear

19

on May 30, 2012, and a body attachment was issued, and investigators engaged in multiple reasonable efforts to locate her since the first hearing.  The court found Gregory was evading service; "as soon as [the investigators] had an idea of where she is, she leaves," including the Carson residence.  The court asked, "Does anybody really believe [Gregory] was not at that house in Carson, when [the investigators] went there?  Of course not, she was there."

> **E.** ***The Prosecution Exercised Due Diligence in Attempting to Secure Gregory's Presence at Trial***

The record of the second hearing reflects the prosecution exercised due diligence to locate Gregory.  Snook and other investigators visited her last known addresses and other locations where she reasonably could be found.  The investigators repeatedly called Gregory's last known telephone number without receiving any response and spoke to her relatives more than once.  The investigators also searched databases and checked with the EDD, police and arrest records, hospitals, and the coroner's office.  The investigators alerted local law enforcement and neighbors to watch for her.  Finally, they attempted to trace Gregory through her use of her EBT card.

Gregory was transient with no valid address or telephone number.  She apparently wanted to avoid the prosecution's efforts to bring her to court, and so such that she was willing to subject herself to being arrested on a body attachment.  Under these circumstances, it appears unlikely Gregory would have cooperated with any additional efforts to secure her presence at trial.  (See *People v. Diaz* (2002) 95 Cal.App.4th 695, 706 [prosecution showed due diligence in trying to secure a witness's

20

presence at trial, in part, because "it is fairly clear [the witness] purposefully made herself unavailable"].)

Johnson, nonetheless, contends the prosecution's investigation into Gregory's "whereabouts was shoddy at best." He posits more could have been done to find Gregory, such as leaving a kiosk message for her and contacting members of where she worshiped. He also faults the investigators for not going to any locations where Gregory's EBT card was used and for not engaging in telephone tapping, telephone tracking or long-term surveillance. However, due diligence " 'requires only reasonable efforts, not prescient perfection.' " (*People v. Diaz, supra*, 95 Cal.App.4th at p. 706.) It does not require engaging in futile acts. (*People v. Smith* (2003) 30 Cal.4th 581, 611.) To the extent that any of Johnson's suggestions were viable, that " 'additional efforts might have been made or other lines of inquiry pursued,' " does not preclude a finding of due diligence. (*People v. Wilson, supra*, 36 Cal.4th at p. 342.) The prosecution's attempts to locate Gregory demonstrated reasonable diligence.

## III. Substantial Evidence Supports Johnson's Conviction

Johnson contends his conviction was not supported by substantial evidence because Gregory and Atkins were not credible witnesses and they alone linked him to Wallace's murder.

The day after Wallace's murder, police officers encountered Johnson and Gregory in a parked car. Between Gregory and the car door, officers found a loaded semiautomatic handgun and arrested both of them. Shell casings retrieved near the location of Wallace's killing came from that gun. Gregory testified at the preliminary hearing that when the police pulled up, Johnson handed her a gun and told her to stash it. Gregory placed the

21

gun on her side of the passenger seat.  Gregory later pleaded guilty to unlawfully possessing a firearm and was placed on probation.  Gregory also testified that after hearing Ray Dawg had been killed a group of armed men, including Johnson and Bailey, left in cars.  When Gregory asked Johnson not to go, he said, "Fuck that.  That's my homey."  Johnson told Gregory two days later that he shot a member of the Broadway Gangster Crips, "[b]ecause they killed Ray Dawg," and "Ray Dawg would have done it for him."

Johnson argues Gregory was an unreliable witness because her preliminary hearing testimony was self-serving and uncorroborated.  According to Johnson, Gregory was anxious to cooperate with the police following her arrest so she would be treated leniently.  Furthermore, he claims, the police paid $5,000 for Gregory to be relocated, and Johnson had a hard cast on his arm at the time so he could not have been the shooter.[4]

Atkins told the police he overheard Bailey tell Atkins's birth mother that he fired five shots at a white truck, and it crashed.  Bailey said Johnson was with him at the time.  The next day, Bailey told Atkins he shot the man in the white truck and Johnson was in the backseat acting as a lookout.  At the preliminary hearing, Atkins recanted these statements.  Atkins testified he had lied during the police interview and "just made stuff up," after being told he could go home.

Johnson argues Atkins was an unreliable witness because he admitted having lied about the shooting during the police

---

[4] The parties stipulated that before and after Wallace's killing, the fingers of Johnson's right hand were immobilized by a hard, nonremovable cast that came up to his elbow.

interview when he testified at the preliminary hearing and later at trial.

Johnson's attack on the credibility of these two witnesses misapprehends the deferential standard of review that governs his appeal. It was the jury's exclusive responsibility to evaluate the demeanor and credibility of the witnesses. "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

Here, Gregory's and Atkins's accounts of Johnson's involvement in the murder were neither physically impossible nor inherently improbable.[5] Moreover, evidence casting doubt on the believability of their accounts was presented to the jury and argued at length by counsel. The jury accordingly was able to judge the truthfulness of Gregory's and Atkins's accounts, and reasonably could have determined Johnson's guilt from such evidence.

## IV. Bailey's Counsel Was Not Presumptively Ineffective

Bailey moved for a new trial, which the trial court denied following an evidentiary hearing. Bailey contends the trial court prejudicially erred in failing to find his former trial counsel, Jack

---

[5] Although it was specially alleged in the information, the jury did not find Johnson personally used and discharged a firearm at Wallace.

Stone, was presumptively ineffective for allegedly sleeping through portions of the trial.

### A. *Applicable Law*

The Sixth Amendment right to assistance of counsel includes the right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 668–674; see Cal. Const., art. I, § 15.)  To establish ineffective assistance of counsel, a defendant must show:  (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness pursuant to prevailing professional norms; and (2) prejudice resulted from counsel's performance.  (*People v. Hoyt* (2020) 8 Cal.5th 892, 958; *Strickland*, at pp. 687–696.)  Prejudice is shown if there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*Hoyt,* at p. 958; *Strickland, supra,* at p. 695.)  Whether counsel's performance was deficient, and whether any deficiency prejudiced defendant are a mixed question of law and fact subject to our independent review, but with deference to the trial court's credibility determinations and factual findings supported by substantial evidence.  (*In re Gay* (2020) 8 Cal.5th 1059, 1073; *In re Thomas* (2006) 37 Cal.4th 1249, 1256.)

### B. *Evidentiary Hearing on the New Trial Motion*

The evidentiary hearing occurred five years after the verdict.  By this time, both defendants were represented by new counsel.  Pertinent to the issue of attorney Stone's trial performance was the hearing testimony of defendant Bailey and Jennifer Rockenback, codefendant Johnson's former trial counsel. Attorney Stone did not testify.

24

At the hearing, Bailey's new counsel George A. Quevado asked if Bailey had "experience[d] any unusual conduct by [attorney Stone]" during the trial.  Bailey answered, "Sometimes he be dozing off, like, he's sleeping like."  Mr. Quevado asked, "Did you bring that to the attention of anybody?"  Bailey answered, "I used to tap [attorney Stone] and had to wake him up so he could pay attention to what's going on sometimes."  Bailey testified that happened "numerous times," "probably six" times.  Mr. Quevado then inquired of Bailey, "And when you tapped [attorney Stone] like that, what, if anything, did he say or do?"  Bailey answered, "He said we got this case beat."

On cross-examination, attorney Rockenback acknowledged to Mr. Quevado that she "had several concerns about [attorney Stone's] lack of attention" during the trial.

"[Mr. Quevado]:  And how many times did this issue arise when you were—when—that you can recall at this point?

"[Ms. Rockenback]:  How many times, what, did I feel concerned?

"[Mr. Quevado]:  Yes.

"[Ms. Rockenback] I don't know that I can quantify it.  Um, I—I can give some examples.

"[Mr. Quevado]:  Okay.  [¶]  Let me ask you this:  Did you have any occasion to have to wake him up during trial?

"[Ms. Rockenback]:  Yes.

"[Mr. Quevado]:  And how many times did you have to do that?

"[Ms. Rockenback]:  At least a couple.

"[Mr. Quevado]:  Okay.  [¶]  And do you recall at this time—I know it's been a long time, we discussed that—but do you

25

recall at this time whether—whether the trial at that point in the proceedings was important to his client?

"[Prosecutor]:  Objection:  Calls for speculation.

"[The court]:  I think even though this isn't a civil case, this would be covered under the doctrine of res ipsa loquitur, it speaks for itself.  [¶]  He's charged with a gang murder.  I think it's probably important to him.  [¶]  Next question.

"[Mr. Quevado]:  Did you have concerns, personal concerns, of the health of Mr. Stone during the trial?

"[Ms. Rockenback]:  Yes.

"[Mr. Quevado]:  And could you describe those concerns to the court?

"[Ms. Rockenback]:  I felt he was forgetful.  He would sometimes, um, call—confuse the name of his client Mr. Bailey with the witness Mr. Atkins, just things like that—confusing the names, sometimes being otherwise forgetful.

"[Mr. Quevado]:  Anything else?

"[Mr. Rockenback]:  No.

"[Ms. Quevado]:  Did—Did you observe whether the— whether he came to court prepared or—unprepared?

"[Ms. Rockenback]:  I know that he—I had about, I think, on any given day, three large binders full of discovery and materials; and I know that he did not come with materials.

"[Mr. Quevado]:  Anything else that you might enlighten the court about that situation?

"[Ms. Rockenback]:  No.

"[Mr. Quevado]:  Okay.  [¶]  Nothing further.  [¶]  Thank you your Honor.

"[The court]:  Okay.  [¶]  Any other examples that you want to give us of Mr. Stone's conduct during the trial?

26

"[Ms. Rockenback]: No."

Following the presentation of evidence, there were numerous continuances of the new trial hearing. Three years elapsed before the trial court heard counsels' arguments and made its ruling. In denying the new trial motion, the trial court discounted Bailey's evidence, finding (1) his 30-page new trial motion and reply never mentioned attorney Stone sleeping during trial; (2) apart from Ms. Rockenback's limited testimony, there was no evidence of when and for how long Stone supposedly slept; and (3) while the court only focused on the attorney who was speaking during the proceedings, it was never informed by anyone in the courtroom that Stone was sleeping.

The court remembered attorney Stone as having an "incredibly sharp" mind and making good tactical decisions, such as retaining Atkins's preliminary hearing testimony, rather than moving to strike it. Finally, the court found even if Stone had "dozed off" there was "no evidence" that "it affected his performance in any way."

C. *The Presumption of Prejudice Recognized in United States v. Cronic (1984) 466 U.S. 648 Does Not Apply*

In support of his claim of ineffective assistance of counsel, Bailey relies on *United States v. Cronic, supra,* 466 U.S. 648 and *Javor v. United States* (9th Cir. 1984) 724 F.2d 831 and to argue prejudice was presumed here. According to Bailey, the evidence attorney Stone slept during trial is uncontroverted and the trial court's res ipsa loquitur comment, in light of that evidence, was a finding Stone was incompetent. Thus, Bailey reasons, the court effectively ruled Stone presumptively provided ineffective assistance. Alternatively, Bailey asserts the trial court's

comment was an abuse of discretion.  He maintains it effectively dissuaded Mr. Quevado from questioning Ms. Rockenback further about the duration and frequency of Stone's sleeping to demonstrate prejudice.  Bailey urges us to remand to enable him to fully present evidence of Stone's incompetence and to be granted a new trial.

In *United States v. Cronic, supra,* 466 U.S. at page 658*,* the United States Supreme Court confirmed that "the burden rests on the accused to demonstrate a constitutional violation" of his or her right to effective assistance of counsel, but it also acknowledged there "are, however, circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."  In this regard, the court held prejudice is presumed when assistance of counsel is denied entirely or at a critical stage of the proceedings, when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, and where the surrounding circumstances make it so unlikely that any lawyer could provide effective assistance that ineffectiveness is properly presumed without inquiry into actual performance at trial.  (*Cronic*, at pp. 658–661; accord, *Bell v. Cone* (2002) 535 U.S. 685, 695–696 [A critical stage is "a step of a criminal proceeding, such as arraignment, that held significant consequences for the accused"].)  In *Javor v. United States*, *supra*, 724 F.2d at page 833*,* the federal appeals court held "when an attorney for a criminal defendant sleeps through a substantial portion of the trial, such conduct is inherently prejudicial and thus no separate showing of prejudice is necessary."  (See *Burdine v. Johnson* (5th Cir. 2001) 262 F.3d 336, 341 ["consistent unconsciousness of [defense] counsel" due to sleeping was ineffective assistance].)

28

*Cronic*'s presumption of prejudice does not apply in this case. The trial court's res ipsa loquitur statement is not a finding that attorney Stone's trial performance was inherently prejudicial because he slept during the proceedings. Read in context, the court made the statement after Ms. Rockenback testified she had to wake Stone at least a couple of times, and Mr. Quevado then asked if she recalled "whether the trial at that point in the proceedings was important to his client?" Mr. Quevado was apparently attempting to elicit Ms. Rockenback's testimony that Stone was asleep at a critical stage of the proceedings. However, the question was poorly worded. It could be construed as inquiring instead whether the trial was subjectively important to Bailey. As the court's interruption made clear, it heard the question that way. The court interjected, using res ipsa loquitur, that the nature of the trial—on a charge of gang murder—obviously speaks for itself as important to Bailey. The rather flippant observation by the court is not a finding of Stone's incompetence.

From our independent review, we cannot conclude attorney Stone slept during a critical stage or a substantial portion of the trial. The court found Bailey's delayed assertion that Stone had dozed off six times not worthy of belief. Ms. Rockenback's testimony failed to indicate the duration and timing of the two occasions she saw the attorney sleeping. The trial court did not notice whether Stone was asleep, but no one in the courtroom, including Bailey, Johnson, and Ms. Rockenback, complained Stone had fallen asleep during any portion of the trial. The evidence does not support a presumption of prejudice.

Bailey's alternative argument lays the blame for the lack of evidence at the feet of the trial court: Its res ipsa loquitur

statement, if not a finding, misled Mr. Quevado to believe the court required no more evidence of attorney Stone's conduct as prejudicial per se.  We disagree.  As discussed, the statement was not a finding.  Neither that statement nor any other comment by the court cut off further questioning about the frequency and duration of the attorney's purported sleeping.  Indeed, Mr. Quevado twice asked Ms. Rockenback if there was "anything else" she could add to her testimony concerning Stone's trial performance.  Each time she answered, "No."  Just before excusing Ms. Rockenback, the court asked if she wanted to give any other examples of Stone's conduct during the trial.  Ms. Rockenback declined.

## V.    Proposition 57 Does Not Violate Equal Protection

Bailey was convicted of murder in 2012, but he was not sentenced until 2019 to an indeterminate term of 55 years to life.  He was awarded presentence custody credits but no presentence conduct credit for the seven years he spent in county jail.  Bailey contends he was entitled to presentence conduct credit.  He argues because, under Proposition 57, he would have been eligible for conduct credit had he been housed in prison, rather than in jail, the denial of his right to such credit simply based on where the state chose to hold him while he awaited sentencing violates equal protection.

A sentencing court may award some criminal defendants presentence conduct credit for good behavior, such as performing labor or complying with rules.  (§ 4019, subds. (b) & (c).)  But, section 2933.2 prohibits any person arrested for or convicted of murder from accruing any presentence conduct or worktime credit.  (§ 2933.2, subds. (a), (c); *People v. Chism* (2014)

30

58 Cal.4th 1266, 1336; *In re Carr* (1998) 65 Cal.App.4th 1525, 1532, fn. 2.)

In November 2016, Proposition 57 was enacted by the California voters, adding article 1, section 32 of the California Constitution. As relevant here, it provides: "The Department of Corrections and Rehabilitation shall have authority to award credits earned for good behavior and approved rehabilitative or educational achievements." (Cal. Const., art. I, § 32, subd. (a)(2); see *People v. Dynes* (2018) 20 Cal.App.5th 523, 526.)

Equal protection requires that "persons who are similarly situated with respect to a law's legitimate purposes must be treated equally. [Citation.] Accordingly, ' "[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." ' [Citation.] 'This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged." ' " (*People v. Brown* (2012) 54 Cal.4th 314, 328.) "The 'similarly situated' prerequisite simply means that an equal protection claim cannot succeed, and does not require further analysis, unless there is some showing that the two groups are sufficiently similar with respect to the purpose of the law in question that some level of scrutiny is required in order to determine whether the distinction is justified." (*People v. Nguyen* (1997) 54 Cal.App.4th 705, 714.) "When one argues two similarly situated groups are being treated differently, it is axiomatic that one group is getting something the other is not." (*In re Cleaver* (1984) 158 Cal.App.3d 770, 774.)

Bailey argues that unlike a pretrial detainee, who is not similarly situated to a state prison inmate (*In re Martinez* (2003)

30 Cal.4th 29, 36), a defendant convicted of murder awaiting sentencing shares more similarities than differences with an inmate serving a sentence for murder.  Whether that is true, neither group is entitled to conduct credit as a matter of law.  Notwithstanding section 2933.2, article 1, section 32 of the California Constitution empowers the Department of Corrections and Rehabilitation, not the courts, to award inmates convicted of murder conduct credit.  And the award of conduct credit is discretionary, not mandatory.  The language of article 1, section 32 of the California Constitution gives the Department of Corrections and Rehabilitation the authority, but does not require it to award conduct credit to inmates.  Thus, although defendants convicted of murder and awaiting sentencing do not receive conduct credit, inmates serving a sentence for murder may also not receive conduct credit under article 1, section 32 of the California Constitution.  "Absent the automatic application of conduct credits, the equal protection argument fails."  (*In re Cleaver, supra*, 158 Cal.App.3d at p. 774; accord *People v. Rosaia* (1984) 157 Cal.App.3d 832, 848; *People v. Caruso* (1984) 161 Cal.App.3d 13, 20, fn. 9.)  Because those inmates who are not awarded conduct credit are treated similarly to defendants like Bailey, we reject his claimed violation of equal protection.

VI.    **Sentencing Issues**

Prior to sentencing, Johnson admitted having suffered a prior serious or violent felony conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(j), 1170.12).  The trial court sentenced him to an aggregate state prison term of 80 years to life, consisting of an indeterminate term of 25 years to life for first degree murder, doubled under the three strikes law, plus 10 years for the section 186.22, subdivision (b)(1)(C) gang

enhancement and 20 years for the section 12022.53, subdivisions (c) and (e)(1) firearm-use enhancement.  The court sentenced Bailey to an aggregate state prison term of 55 to life, consisting of an indeterminate term of 25 year to life for first degree murder, plus 10 years for the section 186.22, subdivision (b)(1)(C) gang enhancement and 20 years for the section 12022.53, subdivision (c) and (e)(1) firearm-use enhancement.  The court imposed but stayed an additional 10-year firearm-use enhancement for each defendant.  Defendants were each awarded presentence custody credits of 3,410 days.

A.    *The 10-year Section 186.22, subdivision (b)(1)(C) Gang Enhancement Should Be Stricken*

In *People v. Lopez* (2005) 34 Cal.4th 1002, 1006 to 1007, the California Supreme Court held that first degree murder committed for the benefit of a gang is subject to the 15-year minimum parole eligibility term in section 186.22, subdivision (b)(5), rather than the 10-year enhancement in section 186.22, subdivision (b)(1)(C).  (See *People v. Francis* (2017) 16 Cal.App.5th 876, 886.)  Bailey contends, the People acknowledge, and we agree, defendants were not subject to the 10-year enhancement.

B.    *We Remand for the Court to Exercise Its Discretion Whether to Impose or Strike the Firearm-use Enhancements*

Defendants were sentenced on May 17, 2019, after the enactment of Senate Bill No. 620 (2017–2018 Reg. Sess.) (Stats. 2017, ch. 682, § 1), which gave trial courts discretion to strike or dismiss previously mandatory firearm enhancements.  However, at the sentencing hearing the court here believed it lacked

sentencing discretion concerning the section 12022.53, subdivisions (c) and (e) enhancements.

Bailey contends, and the People acknowledge, remand is necessary to enable the trial court to determine whether to strike the firearm-use enhancements. We agree and remand for the court to consider whether to impose or strike the firearm-use enhancements for both defendants. (See *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 [remand for resentencing appropriate when court unaware of the scope of its discretionary powers].)

C.     *Bailey Is Entitled to a Franklin Hearing on Remand*

Under section 3051, Bailey will be entitled to a youth offender parole hearing during the 25th year of his sentence. (See § 3051, subd. (a)(1), (b)(3).) When determining whether to grant Bailey parole at that hearing, the Board of Parole Hearings "shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, subd. (c).)

In *Franklin, supra*, 63 Cal.4th at page 283, the California Supreme Court held that juvenile offenders must be given the opportunity to gather information regarding their characteristics and circumstances at the time of the offense to be considered at future youth offender parole hearings, including statements by family members, friends, school personnel, faith leaders, and representatives from the community. (Accord, *In re Cook* (2019) 7 Cal.5th 439, 451 [an offender entitled to hearing under sections 3051 and 4801 may seek remedy of *Franklin* proceeding even though offender's sentence is otherwise final].) Noting that such

34

statements are more easily assembled at or near the time of the juvenile's offense rather than decades later when memories have faded or records have been lost, the court remanded the case to allow the defendant "sufficient opportunity to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing." (*Franklin*, at p. 284.)

Bailey contends he is entitled to remand for a *Franklin* hearing because he was 17 years old when he committed the murder. The People oppose remand, not because Bailey is ineligible for a hearing, but because the record fails to show he was denied "an adequate opportunity to make a record of mitigating youth-related evidence as contemplated in *Franklin*." (Citing *People v. Medrano* (2019) 40 Cal.App.5th 961, 967.) The People point out that Bailey's counsel requested a *Franklin* hearing, but it was never held and urge that he take advantage instead of the procedure specified recently by the California Supreme Court. (See *In re Cook, supra,* 7 Cal.5th at pp. 446–447; *Medrano*, at p. 968.)

Requiring such an additional procedural step is unnecessary here, particularly since the court proceedings have already lasted more than nine years and we are remanding for the trial court to exercise its discretion to impose or strike the firearm-use enhancements. The preferable course is to remand for the trial court to provide Bailey an adequate opportunity to make a record of information relevant to a future youth offender parole hearing under section 3051.

35

## DISPOSITION

We affirm the judgments of conviction as to both defendants but reverse the sentences and remand for the trial court to impose the minimum parole eligibility term of 15 years under Penal Code section 186.22, subdivision (b)(5) in lieu of the enhancement, which is stricken, exercise its discretion with respect to the firearm-use enhancements and provide Bailey a *Franklin* hearing. The trial court is also directed to prepare and forward to the Department of Corrections and Rehabilitation a corrected and certified copy of the abstract of judgment.

NOT TO BE PUBLISHED.


SALTER, J.*

We concur:


EDMON, P. J.


LAVIN, J.

---

\* Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.